239 P.3d 344 (2010)
Laura HOLDEN, Petitioner,
v.
FARMERS INSURANCE COMPANY OF WASHINGTON, a domestic insurer; Farmers Insurance Group, a foreign insurer; Farmers Insurance Exchange, a foreign insurer; and all affiliated Farmers Insurance Companies and/or entities, Respondents.
No. 81487-2.
Supreme Court of Washington, En Banc.
Argued June 25, 2009.
Decided September 9, 2010.
*345 Bradley Jerome Moore, Stritmatter Kessler Whelan Coluccio, Seattle, WA, Garth L. Jones, Ray W. Kahler, Stritmatter Kessler Whelan Coluccio, Hoquiam, WA, for Petitioner.
Danielle S. Fitzpatrick, King & Spalding, Austin, TX, Rogelio Omar Riojas, DLA Piper L.L.P., Seattle, WA, Jeffrey A. Rosenfeld, DLA Piper US, L.L.P., Los Angeles, CA, Philip Albert Talmadge, Talmadge/Fitzpatrick, Tukwila, WA, for Respondents.
STEPHENS, J.
¶ 1 Laura Holden purchased a renter's insurance policy from Farmers Insurance Company of Washington (Farmers). In the event of property loss due to fire, the policy provides coverage for the "actual cash value" (ACV) of the damaged property. ACV is *346 defined as "fair market value" (FMV) at the time of loss. FMV is not defined. After a fire at her rented home damaged some of her personal property, Holden sought coverage under the ACV provision, which states that payments will not exceed the lesser of either policy limits or "the amount necessary to repair or replace the damaged property." Clerk's Papers (CP) at 99. Farmers refused to account for Washington State sales tax when calculating the value of the damaged property. We are asked to decide whether, under the terms of this policy, the ACV provision unambiguously supports Farmers' interpretation, or if instead it is subject to a reasonable interpretation that accounts for sales tax in calculating the FMV of damaged property. Because the ACV provision is ambiguous and accordingly must be construed in favor of the policyholder, we reverse the Court of Appeals and reinstate the trial court's order granting Holden's motion for summary judgment.

FACTUAL & PROCEDURAL HISTORY
¶ 2 On June 9, 2004, a fire broke out in the kitchen of the rented house at which Holden and her three children lived. The fire damaged or destroyed some of the family's personal property, including furniture and various kitchen items. At the time of the fire, Farmers insured Holden under a "Broad Form Renters Package Policy" (Policy), which included coverage for fire damage. CP at 91. The Policy contains the following provision on loss settlement:
Covered loss to property will be settled at actual cash value. Payments will not exceed the amount necessary to repair or replace the damaged property, or the limit of insurance applying to the property, whichever is less.
CP at 99. The Policy defines ACV as "the fair market value of the property at the time of loss." Id. at 93. The Policy does not define FMV or specify what method Farmers will use to calculate ACV or FMV. Nor does the Policy expressly state whether sales tax is accounted for in calculating ACV or FMV.
¶ 3 For an extra premium, Holden also purchased a "Contents Replacement Cost Coverage" endorsement (RCE) with her Policy. CP at 118. The RCE provides for "the full cost of repair or replacement without deduction for depreciation." Id. "Replacement cost" is defined as "the cost, at the time of loss, of a new article identical to the one damaged, destroyed or stolen." Id. The RCE provision requires the insured to actually replace or repair the damaged property within 180 days of the loss. The insured pays the cost of repair or replacement out-of-pocket and submits receipts to Farmers for reimbursement under the RCE. Farmers often pays sales tax under the RCE, upon proof that it has been incurred.
¶ 4 After the fire, Holden submitted a claim to Farmers under the ACV provision of the Policy. Farmers sent Holden a check for $1,174.41, an amount Farmers determined to be the FMV of Holden's property. This amount was calculated with no regard to Washington state sales tax. When Holden requested that sales tax be included in calculating her reimbursement, Farmers informed Holden that if she submitted receipts for coverage under the RCE, only then would her reimbursement include sales tax. Holden explained in her deposition that she opted not to submit her claims under the RCE because she could not afford to pay the out-of-pocket repair or replacement cost and wait for reimbursement from Farmers. Id. at 61, 82.
¶ 5 Holden brought a putative class action against Farmers, seeking a declaration that sales tax should be accounted for in the ACV calculation for her claim and requesting relief for all similarly situated insureds. During discovery, Farmers disclosed that it uses a variety of methods to calculate FMV under the ACV provision, including surveying online markets, hiring an appraiser, and using a replacement-cost-less-depreciation formula. Farmers acknowledged that when it uses replacement cost less depreciation to calculate FMV, replacement cost sometimes includes sales tax. Under the ACV provision, Farmers includes sales tax in replacement cost when the policyholder replaces the damaged property.[1] CP at 142; Report of Proceedings at 75-76, 78.
*347 ¶ 6 After discovery, Farmers and Holden filed cross motions for summary judgment. The superior court granted Holden's motion and denied Farmers' motion. The court reasoned that because Farmers uses various methods to determine FMV under the ACV provision, the definition of FMV is subject to more than one reasonable interpretation, thereby making the term ambiguous. As a result, the trial court ruled that the ambiguity must be construed in favor of the insured with sales tax being part of FMV for purposes of Farmers' policy.
¶ 7 The superior court certified the summary judgment order for immediate appeal pursuant to RAP 2.3(b)(4). Farmers filed a motion for discretionary review, which Division One of the Court of Appeals granted. The Court of Appeals then reversed, holding that coverage under the ACV provision does not include sales tax because replacement cost considerations apply only when the property is actually replaced. Holden v. Farmers Ins. Co. of Wash., 142 Wash.App. 745, 752, 175 P.3d 601 (2008). Holden filed a petition for review, which we granted. Holden v. Farmers Ins. Co. of Wash., 164 Wash.2d 1025, 195 P.3d 957 (2008).

ANALYSIS
¶ 8 Interpretation of an insurance contract is a question of law reviewed de novo. NH Indem. Co., Inc. v. Budget Rent-A-Car Sys., Inc., 148 Wash.2d 929, 933, 64 P.3d 1239 (2003). We look to the whole contract, giving it a "`fair, reasonable, and sensible construction.'" Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, 427, 951 P.2d 250 (1998) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wash.2d 618, 627, 881 P.2d 201 (1994)). We give the language of the insurance policy the same construction that an "`average person purchasing insurance'" would give the contract. Woo v. Fireman's Fund Ins. Co., 161 Wash.2d 43, 52, 164 P.3d 454 (2007) (quoting Roller v. Stonewall Ins. Co., 115 Wash.2d 679, 682, 801 P.2d 207 (1990)).
¶ 9 When, as here, a policy term is undefined, it must be given its "`plain, ordinary, and popular'" meaning. Kitsap County v. Allstate Ins. Co. 136 Wash.2d 567, 576, 964 P.2d 1173 (1998) (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 784 P.2d 507 (1990)). A term will be deemed ambiguous if it is susceptible to more than one reasonable interpretation. Id. To help resolve ambiguity, we may look to context and the intent of parties. Quadrant Corp. v. Am. States Ins. Co., 154 Wash.2d 165, 171-72, 110 P.3d 733 (2005). Any remaining ambiguity must be construed against the insurer and in favor of the insured. Id. at 173, 110 P.3d 733.[2]
¶ 10 The ACV coverage at issue provides for the settlement of losses according to the FMV of the damaged property. Farmers advances a technical definition of FMV, but it is the ordinary understanding of the contract that controls. A technical approach fails to account for the way Farmers actually implements the ACV coverage provision. One method Farmers uses to calculate FMV looks at current replacement cost less depreciation. Farmers admits that it sometimes calculates replacement cost to include sales tax, representing the amount of money a buyer would actually have to spend to replace the damaged property. The language of the ACV provision plainly allows for looking at replacement cost in calculating the insured's loss:

*348 Covered loss to property will be settled at actual cash value. Payments will not exceed the amount necessary to repair or replace the damaged property, or the limit of insurance applying to the property, whichever is less.
CP at 99 (emphasis added). This policy provision suggests to the average insurance consumer that his or her loss will be determined according to what it would cost to replace the property, less depreciation to reflect the age or wear and tear of the damaged property.[3]
¶ 11 Yet, Farmers argues and the dissent concludes that sales tax must be excluded from any replacement cost calculation on the ground that FMV, as used in other contexts, excludes consideration of taxes. See Farmers' Suppl. Br. at 8-12; Dissent at 350-51. The dissent notes that inheritance tax and property tax are assessed on the FMV of taxable items before tax. If tax were included, the argument goes, an endless cycle would be created because one would need to know the tax in order to determine the FMV, in order to determine the tax, etc. The problem with this "chicken and egg" argument is that the meaning of FMV in other contexts is irrelevant. Its meaning in the context of this insurance contract is what matters, which is why Farmers' own practice of including sales tax is critical. Indemnifying a policyholder for his or her actual loss is quite different from valuing property for the purpose of assessing an inheritance, property, or capital gains tax.
¶ 12 Nor does it advance the argument to say that the traditional notion of FMV necessarily excludes transaction costs, such as sales tax, because these extra costs do not add to the value of an object. Farmers' policy does not define FMV in this manner. Indeed, it does not define the term at all. We have recognized in other contexts that the common understanding of "`"[f]air market value" is the amount of money which a well informed buyer, willing but not obliged to buy the property, would pay, and which a well informed seller, willing but not obligated to sell it, would accept.'" State v. Rowley, 74 Wash.2d 328, 334, 444 P.2d 695 (1968) (quoting a jury instruction). Sales tax represents a portion of the actual out-of-pocket expense to the buyer and bears on the decision to buy. Accordingly, there is nothing intrinsic in the notion of FMV that necessarily includes or excludes sales tax.[4]
¶ 13 Faced with the fact that Farmers only sometimes interprets FMV to include sales taxnamely, when a policyholder replaces damaged property under the ACV provisionthe Court of Appeals asserted that such practice reflects "a consistent application of the principles of indemnification." Holden, 142 Wash.App. at 752, 175 P.3d 601. But, whether an ACV claimant actually replaces damaged property has no logical bearing on the property's FMV. Consider an example in which two different policyholders own identical sofas that are destroyed in fires. Each seeks coverage under the ACV provision, so Farmers must determine the sofas' ACVs. If one of the policyholders buys a new sofa, does this fact affect the value of the old sofa that was destroyed? Does it mean that this policyholder's sofa was worth more than the identical sofa of the policyholder who did not buy a new one? Of course not; the value of the old sofas was the *349 same without regard to these circumstances. The sole purpose in using a replacement-cost-minus-depreciation method of valuation is to estimate the policyholder's loss. This loss is the same regardless of whether the sofa is actually replaced.
¶ 14 Farmers argues that indemnity does not support including sales tax in the ACV calculation when an RCE-covered insured does not replace the property. See Farmers' Suppl. Br. at 14-15, 17. This argument insinuates that the same ACV language should be interpreted differently depending upon whether the policyholder also purchased RCE coverage. Cf. Dissent at 352-53 (interpreting Holden's ACV coverage differently because she also purchased RCE coverage). The indemnity argument fails to recognize Holden's full loss and does not reflect how ACV coverage works. Regardless of whether the insured replaces the lost or damaged property, she paid sales tax when buying it originally. Holden's loss, for example, included the sales tax she paid when she bought the furniture and kitchen items. Furthermore, taking sales tax into account does not result in her reaping a windfall. Holden is not being paid an amount for sales tax she never incurred. Rather, the sales tax is simply included in calculating the replacement cost of the damaged property before subtracting for depreciation, which is one way to estimate the property's current value. Under Farmers' indemnity analysis, Holden is denied the full benefit of her ACV coverage because she purchased RCE coverage but did not use it.
¶ 15 There is no legal authority for interpreting a policy provision differently for different policyholders depending on what other coverage is purchasedespecially when that other coverage is not at issue. The ACV provision, the only provision at issue here, makes no distinction between the value of ACV coverage when a policyholder has the wherewithal to immediately replace all lost or damaged property versus when he or she must instead settle for the cash and replace what he or she can. Holden is entitled to the ACV of her damaged property whether or not she is able to use the insurance proceeds to repair or replace it. Focusing on the ACV provision, as we must, it is at least ambiguous in terms of whether the calculation of ACV will be based on a replacement cost formula that includes sales tax. Given such ambiguity, Holden's reasonable interpretation of the policy must be accepted.[5]
¶ 16 To the extent Farmers relies on precedent to argue that ACV cannot mean replacement cost (including sales tax) minus depreciation, it misconstrues our case law. Farmers cites National Fire Insurance Co. v. Solomon, 96 Wash.2d 763, 638 P.2d 1259 (1982), for the proposition that FMV cannot be calculated using the replacement-cost-less-depreciation method. As the Court of Appeals noted, however, neither Solomon nor our subsequent decision in Hess v. North Pacific Insurance Co., 122 Wash.2d 180, 859 P.2d 586 (1993), controls the analysis here because those cases concerned the interpretation of a replacement cost coverage provision, not an ACV provision. Holden, 142 Wash.App. at 751, 175 P.3d 601. The Court of Appeals further noted that any commentary about ACV in those opinions was dictum and neither decision addressed the issue of sales tax. Id. We agree with the Court of Appeals that we are not bound by the discussion of ACV in either opinion.
¶ 17 Because the ACV provision in Farmers' policy is ambiguous, it must be read favorably to insureds to include consideration of Washington State sales tax in calculating the FMV of damaged property. This does not result in a "windfall" to an insured who *350 does not immediately replace damaged property. Instead, it returns the insured to the same financial position he or she enjoyed before suffering a property loss.

CONCLUSION
¶ 18 The value of coverage under the ACV provision of Farmers' policy does not clearly exclude sales tax on damaged or destroyed property. While the policy defines ACV as FMV, it gives no definition of FMV. Neither does the traditional notion of FMV exclude sales tax from its definition. Farmers sometimes accounts for sales tax when calculating FMV. Moreover, the ACV provision indicates that the measure of recovery is related to "the amount necessary to repair or replace the damaged property." CP at 99. This language, combined with Farmers' practices and the absence of a definition for FMV, creates an ambiguity as to whether sales tax is included under the ACV provision of the Policy. Because we construe this ambiguity against Farmers, the Policy must be read to include consideration of Washington State sales tax. We reverse the Court of Appeals and remand for further proceedings consistent with this opinion.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, RICHARD B. SANDERS, TOM CHAMBERS, and MARY E. FAIRHURST, Justices.
J.M. JOHNSON, J. (dissenting).
¶ 19 Laura Holden seeks reimbursement under her renter's insurance policy for the "actual cash value" (ACV) of personal property damaged during a fire in her apartment. Holden's insurance policy defines ACV as the "fair market value" (FMV) of the property at the time of loss. Because the majority erroneously holds that a (theoretical) sales tax should be added to the reimbursement based on its conclusion the term FMV is ambiguous, I respectfully dissent.
¶ 20 The majority concludes that the definition of ACV results in ambiguity because of the use of different methodologies to determine FMV in different contexts. Majority at 346-47, 349. In the majority's view, this results in FMV having more than one reasonable interpretation, which renders it ambiguous. Id. at 351 (citing Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 576, 964 P.2d 1173 (1998)). However, the term FMV is capable of a single reasonable interpretation that unambiguously excludes sales tax in this context. See Quadrant Corp. v. Am. States Ins. Co., 154 Wash.2d 165, 171-72, 110 P.3d 733 (2005) (context and intent of parties are relevant considerations when interpreting contracts).
¶ 21 Reading FMV so as to exclude taxesboth in Holden's insurance policy and elsewherecaptures the likely perceptions of "`the average person purchasing insurance,'" the perspective that we must assume when interpreting insurance contracts. Overton v. Consol. Ins. Co., 145 Wash.2d 417, 424, 38 P.3d 322 (2002) (quoting Sears v. Grange Ins. Ass'n, 111 Wash.2d 636, 638, 762 P.2d 1141 (1988)). Indeed, viewed from the perspective of ordinary insurance customers like Holden, it is the only reasonable interpretation of the term. To illustrate, consider the fact that it is customary to calculate taxes based on FMV or "market value," not to calculate FMV inclusive of taxes. In calculating the FMV of various bonds for inheritance tax purposes, for example, this court specified that the term means "the amount of money which a purchaser willing, but not obligated, to buy would pay an owner willing, but not obligated to sell." In re Estate of Eggert, 82 Wash.2d 332, 335, 510 P.2d 645 (1973); see also In re Estate of Toomey, 75 Wash.2d 915, 919, 454 P.2d 420 (1969) (inheritance tax "must, therefore, be measured by what is called the fair market value"). Likewise, in commenting on property taxes based on "market value," this court indicated that the term means "what a willing buyer under no obligation to buy would pay a willing seller under no obligation to sell." Wash. Beef, Inc. v. Yakima County, 143 Wash.App. 165, 172, 177 P.3d 162 (2008); see also Cascade Court Ltd. P'ship v. Noble, 105 Wash. App. 563, 567, 20 P.3d 997 (2001) (giving the same definition).
¶ 22 Leaving aside the fact that a willing seller is unlikely to include sales tax in the amount that he would accept for an item, *351 given that the State, not the seller, receives that tax, FMV in these two tax contexts are not calculated so as to include taxes; rather, taxes are derived from FMV. An average person buying insurance surely has paid property taxes during his or her lifetime and perhaps has dealt with inheritance taxes after the death of a loved one, and thus would be aware of this relationship. Accordingly, he or she would conclude that FMV does not include taxes such as sales tax.
¶ 23 This conclusion receives further support from definitions of "value" used in other tax contexts.[1] For instance, we calculate the FMV of mineral properties by looking at "price" and "valuations for purposes of state and local taxation," Donaldson v. Greenwood, 40 Wash.2d 238, 252, 242 P.2d 1038 (1952), figures that obviously do not include taxes. We similarly calculate capital gains taxes based on the FMV of investments, not the other way around. Chatterton v. Bus. Valuation Research, Inc., 90 Wash.App. 150, 151-52, 951 P.2d 353 (1998). It thus appears axiomatic that FMV does not include any kind of tax, not just sales tax. Indeed, a contrary conclusion would trap us in an endless loop of calculating value: we would have to include taxes in "value," but since taxes themselves are based on value, we would have to calculate taxes before ascertaining value, which would require knowing the relevant taxes, etc. We cannot calculate taxes using value and value using taxes; either the chicken or the egg must come first. An "`average person purchasing insurance,'" Woo v. Fireman's Fund Ins. Co., 161 Wash.2d 43, 52, 164 P.3d 454 (2007) (quoting Roller v. Stonewall Ins. Co., 115 Wash.2d 679, 682, 801 P.2d 207 (1990), overruled on other grounds by Butzberger v. Foster, 151 Wash.2d 396, 89 P.3d 689 (2004)), would avoid this dilemma by concluding that FMV does not include taxes of any kind. Any other interpretation of the term would be unreasonable in light of our customary definition of FMV in other contexts and the illogical results engendered by the opposite conclusion. There being only one reasonable interpretation of the term, neither FMV nor the ACV provision is ambiguous. In the absence of ambiguity, we interpret insurance contracts according to the plain, ordinary, and popular meaning of their terms. Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173. Thus, we look to the plain, ordinary, and popular meaning of FMV in order to understand the extent of Holden's ACV coverage. This analysis replicates much of the discussion of an "average person purchasing insurance" outlined above, since it seems indisputable that all but the most sophisticated of persons purchasing insurance give policy terms their plain, ordinary, and popular meanings. Woo, 161 Wash.2d at 52, 164 P.3d 454. The meaning of FMV thus necessarily incorporates our customary treatment of value, see In re Estate of Eggert, 82 Wash.2d at 335, 510 P.2d 645; In re Estate of Toomey, 75 Wash.2d at 919, 454 P.2d 420; Donaldson, 40 Wash.2d at 252, 242 P.2d 1038; Wash. Beef, Inc., 143 Wash.App. at 172, 177 P.3d 162; Cascade Court, 105 Wash.App. at 567, 20 P.3d 997; Chatterton, 90 Wash.App. at 151-52, 951 P.2d 353, and therefore excludes sales tax.[2]
¶ 24 Interpreting FMV so as to exclude sales tax also captures its legal, technical meaning, although, as the majority rightly observes, this meaning merely informs our analysis and does not control it. Majority at 347-48. To give an example, the Washington Pattern Jury Instructions define FMV in the context of eminent domain as:
the amount in cash that a well-informed buyer, willing but not obligated to buy the property, would pay, and that a well-informed *352 seller, willing but not obligated to sell it, would accept....
6A Washington Practice: Washington Pattern Jury Instructions: Civil 150.08, at 76 (5th ed.2005); see also State v. Brown, 132 Wash.2d 529, 611-12, 940 P.2d 546 (1997) (courts must define "technical" terms used in jury instructions); State v. Rowley, 74 Wash.2d 328, 334, 444 P.2d 695 (1968). This instruction does not mention sales tax, nor can it realistically be argued that the amount of cash that a well-informed seller would accept includes sales tax. See supra p. 3. Thus, in both technical and ordinary usage, and to an average person purchasing insurance, FMV in an insurance contract such as Holden's clearly means the market price exclusive of sales tax.
¶ 25 Even if FMV standing alone in Holden's ACV coverage is ambiguous, which for the foregoing reasons it is not, it emphatically is not ambiguous when one considers the term in relation to the entirety of Holden's insurance policy. Holden paid an additional premium to supplement her basic ACV coverage with a replacement cost endorsement (RCE), which promised to reimburse her for "the full cost of repair or replacement" if she repaired or replaced damaged or destroyed items. Clerk's Papers (CP) at 118. Presumably, Holden did so because she did not believe she had such coverage under the ACV provision. The parties agree that the RCE included reimbursement for any sales tax paid as a result of repair or replacement. Yet, according to the majority's reading of FMV, the ACV provision already covered the full cost of repair or replacement, inclusive of sales tax, regardless of whether Holden actually replaced the property or incurred the tax.
¶ 26 It is difficult to understand why an insured who is eligible to receive the full replacement cost of insured items without actually replacing them would purchase a second insurance product reimbursing the full replacement cost only after replacement has occurred. But under the majority's interpretation of FMV, this is exactly what Holden did when she purchased the RCE to supplement her ACV coverage.[3] The majority believes that the RCE and the ACV coverage give Holden virtually the same thing: a check for the replacement cost, including sales tax, the only difference being that the RCE reimburses Holden for the replacement cost of the property after replacement, whereas the ACV provision pays up front the amount needed to replace it regardless of whether replacement occurs. Thus, the majority gives Holden a choice between (i) replacing her property and being reimbursed for the cost, including sales tax, and (ii) receiving the cash value of that reimbursement in advance of replacement. If she chooses the second option, Holden need not even use the cash to replace the property in question; the sum becomes a windfall, at least to the extent she is given money for taxes that she may never pay.[4]
¶ 27 We give insurance contracts a "`practical and reasonable rather than literal interpretation', and not a `strained and forced construction' leading to absurd results." Eurick v. Pemco Ins. Co., 108 Wash.2d 338, 341, *353 738 P.2d 251 (1987) (quoting E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co., 106 Wash.2d 901, 907, 726 P.2d 439 (1986)). It is neither practical nor reasonable to interpret FMV so as to result in essentially redundant coverage (and an average person buying insurance would not make this costly mistake),[5] yet the majority's interpretation of the term produces such a result. I would avoid this absurd result by interpreting FMV in relation to the whole of Holden's policy both the ACV provision and the RCE. Such a reading leads to the conclusion that, even if FMV is ambiguous elsewhere, there can be no doubt that the term unambiguously does not include sales tax under Holden's ACV coverage.
¶ 28 As a final observation, the language of Holden's ACV coverage does not support the automatic award of sales tax to Holden, even if, despite the analysis above, sales tax is included in the compensation due under that provision, which reads:
Covered loss to property will be settled at actual cash value. Payments will not exceed the amount necessary to repair or replace the damaged property, or the limit of insurance applying to the property, whichever is less.
CP at 99. Although the ACV clause includes the words "the amount necessary to repair or replace," one cannot in good faith rewrite the clause to read: "Covered loss to property will be settled at ... the amount necessary to repair or replace the damaged property." The reference to the cost of repair or replacement merely sets an upper limit on compensation owed under the ACV provision, not an automatic level of compensation.[6]
¶ 29 Thus, even if the amount owed under the ACV provision includes sales tax, which it does not, the language of that provision does not suggest to the average insurance consumer that his or her loss will always be covered at replacement cost and therefore will always include sales tax. Contra majority at 347-48. Rather, the provision suggests that the amount disbursed cannot exceed that cost; it sets a ceiling, not a floor.[7] If automatic compensation for the replacement cost is not part of the ACV provision, it follows that automatic payment of prospective sales tax is also not part of that provision. Accordingly, even if FMV takes account of sales tax, Holden is not automatically entitled to a check from Farmers for the sales tax that she would have incurred had she replaced her property.[8]

*354 Conclusion
¶ 30 I would hold that Holden's ACV coverage cannot reasonably be interpreted so as to require payment of sales tax in addition to the market value of a loss. Indeed, Holden could not have understood the ACV provision in her policy to so require. The provision is neither susceptible to more than one reasonable interpretation nor ambiguous, and we therefore should not construe it in favor of the insured. This holding maintains consistency with the ordinary and technical meanings of the term "fair market value" (FMV), the definition of ACV under the policy, avoids redundancy in the two insurance products held by Holden, and comports with the language of the ACV policy provision itself. Because the majority dismisses these compelling considerations and erroneously concludes that Holden's ACV coverage includes payment for (unpaid) sales tax, I dissent.
WE CONCUR: GERRY L. ALEXANDER and SUSAN OWENS, Justices.
NOTES
[1] Farmers may also include sales tax in calculating loss under the ACV provision when the homeowner does not replace the property but the amount of depreciation is small. For example, if a policyholder bought a toaster for $30 plus sales tax, and the toaster were destroyed the next day, Farmers admits that the ACV of the toaster would be $30 plus tax. This is because Farmers would include sales tax in the replacement cost, and then subtract zero depreciation for the one day the toaster was owned. CP 140-41.
[2] This rule of construction is no less applicable for a policy provision approved or mandated by the insurance commissioner, as in a fire insurance policy. The particular policy language remains a matter of choice for the drafter, so long as it is "not less favorable to the insured than the `standard fire policy.'" WAC 284-20-010(3)(c). There is no support in our case law for Farmers' proposition that the normal rules of construction do not apply when a policy provision is drafted by an insurer in conformance with applicable insurance regulations.
[3] The dissent insists that the policy does not say that ACV equals replacement cost, but merely that any payout will not exceed replacement cost. Dissent at 353. True, but the reference to replacement cost in the ACV coverage provision undercuts the dissent's view that no reasonable policyholder could believe that the sales tax incurred in replacing damaged property would be accounted for. The question is not whether ACV is defined as replacement cost, but rather what method or methods are allowed to calculate ACV. The policy does not specify a method. From its practice when settling other ACV claims, we know that Farmers reads the policy language to allow the inclusion of sales tax in the replacement-cost-less-depreciation method of determining FMV. It is not unreasonable for an insured to read the policy in the same way.
[4] Indeed, the Washington State insurance commissioner issued a bulletin relating to sales tax and ACV claims, advising that sales tax must be dealt with by insurers "in good faith." CP at 224 (Wash. Office of Ins. Comm'r, Bulletin No. 89-3 (Apr. 5, 1989)). The bulletin notes that in ACV claims, "the cost of repairing and restoring a building or other object to the condition it was in before the loss is not only material, but is the most persuasive evidence of the amount of loss for which the insurer is liable. Obviously, such costs will include sales tax." Id.
[5] The dissent incorrectly asserts that under Holden's reading of the policy, the ACV and RCE coverages would be redundant. Dissent at 352-53. Besides the differences between how the coverages operate, as identified in the main text, a principal benefit of the extra RCE coverage is that the loss is settled at replacement cost without regard to depreciation. In contrast, the FMV of damaged property under the ACV coverage is depreciated. This difference has nothing to do with the inclusion or exclusion of sales tax, which is not a unique benefit of RCE coverage. The record is clear that Farmers accounts for sales tax under both the ACV and RCE coverages in some instances. Although it refused to do so in Holden's case, as discussed above, the policy language does not unambiguously preclude accounting for sales tax in paying claims under the ACV coverage.
[1] The majority is mistaken when it insists that the meaning of FMV under Holden's insurance contract is the only meaning that matters in this case. Majority at 348. An average person purchasing insurance such as Holden does not consider an insurance contract in isolation, but rather approaches the policy with an understanding of FMV influenced by his or her encounters with the term in various other contexts; we should do the same.
[2] Confirming this conclusion, the Merriam-Webster Dictionary defines FMV as "a price at which buyers and sellers with a reasonable knowledge of pertinent facts and not acting under any compulsion are willing to do business." Merriam-Webster Online Dictionary, http://www.Merriam-Webster.com/dictionary/fairmarketvalue (last visited Sept. 8, 2010). This does not include sales tax.
[3] Judging from her ownership of not one but two types of insurance coverage for her rented home, Holden is an unusually prudent, sensible, and risk-averse consumer. In a nation where only 40 percent of renters even bother to purchase renters insurance at all, see Press Release, The Allstate Corporation, With Renters on the Rise, Americans Face Increasing Risk for Property Loss (July 22, 2008), available at http://www.reuters.com/article/idUS132937 + 22-Jul-2008 + PRN20080722 (last visited Sept. 8, 2010), Holden purchased two different insurance products to ensure full compensation for any loss suffered as a result of fire or other misfortunes, CP at 96. It is evident from these facts that Holden is an especially conscientious insured, and is even less likely than the average person purchasing insurance to pay for redundant coverage.
[4] The majority asserts that this is not a windfall but rather merely returns Holden to the same financial position that she enjoyed before the fire. Majority at 348-50. This is incorrect. Reimbursing Holden for both the value of her damaged property and the sales tax that she spent to acquire it returns her to the same financial position that she enjoyed before purchasing the propertythat is, before she paid its purchase price (i.e., its value) and the associated sales tax. It does not return her to the same financial position that she enjoyed before the fire; there, she had possession of the property (i.e., its value) but not the sales tax, having already spent that sum to acquire the property.
[5] It is true that the RCE differs from the ACV provision in that the former does not account for depreciation in calculating the replacement cost, whereas the latter does. Majority at 349 n. 5. This distinction has little to do with the issue at hand, however, which is whether the RCE and the ACV provision both account for sales tax in calculating the replacement cost.
[6] Holden was made aware of this fact when she sought compensation for her damaged property. Indeed, Farmers twice reminded Holden by letter that, although she was not entitled to payment for this tax under the ACV provision, she would be reimbursed for all applicable sales taxes if she replaced the damaged items and submitted a claim under the RCE with receipts documenting the tax. CP at 370, 392. Nevertheless, Holden demanded compensation for the tax as part of her ACV coverage, not under the RCE, and wrote several letters to the Office of the Insurance Commissioner complaining of Farmers' failure to pay it. CP at 304-06, 309-19, 325-55, 362-63. The Office of the Insurance Commissioner forwarded the letters to Farmers, in response to which Farmers again maintained that its policies reimbursed sales tax only if the insured actually incurred it. CP at 304-06, 308, 321-24, 361, 365-66.
[7] The majority mischaracterizes this argument as reliant on the conclusion that "no reasonable policyholder could believe that the sales tax incurred in replacing damaged property would be accounted for." Majority at 348 n. 3 (emphasis added). In fact, it relies on the conclusion that the average policyholder would not reach this conclusion, not that no reasonable policyholder ever could. Precedent requires us to use this "average person" standard when we interpret insurance contracts. See Woo, 161 Wash.2d at 52, 164 P.3d 454.
[8] Complicating the matter further, sales tax varies by county, city, and state. Indeed, had Holden purchased replacement goods in Oregon, she ostensibly would need no reimbursement at all for sales taxes. This variance makes it impossible to determine the amount of sales tax that Holden actually would have incurred and that, under the majority's interpretation of the ACV provision, Farmers must pay. Thus, even if we were to accept Holden's reading, we would have no way of ascertaining the precise sum owed by Farmers. We do not recognize such imprecise claims. Cf. United Pac. Ins. Co. v. Lundstrom, 77 Wash.2d 162, 172-73, 459 P.2d 930 (1969) (holding that a claim could not be legally attached where, "[a]t the time of ... attachment ... [t]he value of [the] judgment could not be mathematically calculated with any degree of certainty before something else happened"). Here, the "something else" that must happen before the amount that Holden claims to be owed can be calculated is, first, the replacement of the damaged property, and second, the actual payment of sales tax, neither of which happened here.