**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| LESLIE  W.  and  HARLENE  E.  ROBBINS, husband and wife, | No.  50376-0-II |
| Appellants, | PUBLISHED OPINION |
| v. | |
| MASON   COUNTY   TITLE   INSURANCE COMPANY;   and   RETITLE   INSURANCE COMPANY, | |
| Respondents. | |

BJORGEN, J. — Leslie W. Robbins and Harlene E. Robbins appeal from an order granting

the motion for summary judgment by Mason County Title Insurance Company (MCTI)[1] and

denying the Robbinses' cross-motion for partial summary judgment.

The Robbinses assert that the terms of their title insurance policy obligated MCTI to

defend against a claim by the Squaxin Island Tribe (Tribe) that the 1854 Treaty of Medicine

Creek[2] (Treaty) gave it the right to take shellfish on the Robbinses' tidelands.  The Robbinses

also argue that because MCTI unreasonably breached its duty to defend, the company acted in

bad faith as a matter of law and should be estopped from denying coverage.  The Robbinses also

request us to award them attorney fees and costs incurred both in the superior court and in this

appeal.

MCTI asserts that the Robbinses' policy did not afford coverage and that it was under no

duty to defend. MCTI also claims there was nothing to defend against, since the underlying

---

[1] MCTI, at the time this action arose, was known as Retitle Insurance Company.

[2] 10 Stat. 1132, 1854 WL 9477.

issues between the Robbinses and the Tribe were already determined by litigation concerning the scope of tribal shellfish rights.  MCTI further argues that the general exception[3] for "public or private easements not disclosed by the public records" applies to the Robbinses' claim.  Finally, MCTI argues it pled several affirmative defenses that the superior court has yet to consider.

We hold that MCTI owed a duty to defend under the policy, its failure to do so constituted bad faith, and MCTI is estopped from denying coverage.  We remand to the superior court to consider the merits of MCTI's affirmative defenses.  Because those defenses remain to be decided, any decision on attorney fees and costs is premature.

Accordingly, we reverse and remand.

FACTS

In 1978, the Robbinses purchased two tracts of land, which included tidelands formerly owned by the state of Washington.  The Robbinses also purchased a policy of title insurance from MCTI dated June 12, 1978, which provides that MCTI would insure the Robbinses "against loss or damage sustained by reason of: . . . [a]ny defect in, or lien or encumbrance on, said title existing at the date [t]hereof."  Clerk's Papers (CP) at 228-32.  More specifically, the policy states, in pertinent part:

> 1. The Company shall have the right to, and will, at its own expense, defend the insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein.

CP at 232.  The policy contains several general exceptions, including "public or private easements not disclosed by the public records."  CP at 231.  The policy defines "public records"

---

[3] We refer to the policy exclusions as "exceptions" because that is the terminology used in the contract.

as "records which, under the recording laws, impart constructive notice with respect to said real estate." CP at 232.

After purchasing the property, the Robbinses entered into contracts with a number of commercial shellfish harvesters. One of the harvesters notified the Tribe of his intent to harvest shellfish on the Robbinses' property. The Tribe sent the harvester a letter requesting more information, disagreeing with the harvester's opinion that the Robbinses' clam bed was not natural, and referring to its rights under the Shellfish Implementation Plan, adopted to implement *United States v. State of Washington*, 898 F. Supp. 1453 (W.D. Wash. 1995), *aff'd in part*, 135 F.3d 618 (9th Cir. 1998).

The Robbinses subsequently became aware of the Tribe's desire to harvest shellfish on their tidelands and tendered a claim to MCTI on July 8, 2016, for defense against the Tribe's asserted right. On July 26, the Tribe sent the Robbinses a certified letter outlining its plan to harvest shellfish on their tidelands in accordance with *United States v. Washington* and the Shellfish Implementation Plan. The Tribe based this claim on its rights under the Treaty and *United States v. Washington* to take 50 percent of the harvestable shellfish biomass within its usual and accustomed grounds and stations. On August 9, MCTI sent the Robbinses a letter that declined any duty to defend the Tribe's claim on the Robbinses behalf; the letter advised, among other things, that there was no coverage under their policy for the Tribe's claim.

The Robbinses filed a complaint against MCTI for damages caused by its claimed improper refusal to defend and requesting that MCTI be estopped from denying coverage. MCTI filed its answer and affirmative defenses, which included the statute of limitations, laches, waiver, failure to mitigate damages, failure to submit proof of loss, failure to state a claim,

failure to state a cause of action, election of alternative remedies, and a claim that plaintiffs have suffered no damages.

MCTI filed a motion for summary judgment, arguing that because the Robbinses' policy did not afford coverage for the Tribe's asserted Treaty right, there was no duty to defend. MCTI's motion for summary judgment did not argue any of the affirmative defenses set forth in its answer, but only addressed coverage.

The Robbinses then filed a cross-motion for partial summary judgment. The Robbinses argued that their policy afforded coverage, no general exceptions applied, and MCTI had a duty to defend against the Tribe's claim to harvest shellfish on their tidelands. The Robbinses' cross-motion for partial summary judgment did not request summary judgment on any of MCTI's affirmative defenses. In its response to the Robbinses' cross-motion for partial summary judgment MCTI argued, among other matters, that its motion for summary judgment only sought to determine the issue of coverage, its affirmative defenses are to some degree based in fact, and it had not had the opportunity to conduct discovery, in particular on the defenses of statute of limitations, laches, waiver, and mitigation of damages.

The superior court granted MCTI's motion for summary judgment and denied the Robbinses' motion for partial summary judgment. As part of its order, the superior court dismissed all of the Robbinses' claims with prejudice.

The Robbinses appeal.

## ANALYSIS

### I. SUMMARY JUDGMENT

The Robbinses argue the superior court erred when it granted MCTI's motion for summary judgment and denied their cross-motion for partial summary judgment. We agree.

A.      Standard of Review and Legal Principles

We review an order for summary judgment de novo, engaging in the same inquiry as the superior court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Fahn v. Cowlitz County*, 93 Wn.2d 368, 373, 610 P.2d 857 (1980).

Ambiguities in insurance policies are to be interpreted in favor of the insured. *Holden v. Farmers Ins. Co. of Wash.*, 169 Wn.2d 750, 756, 239 P.3d 344 (2010). Language in an insurance contract is to be given its plain meaning, and courts should read the policy as the average person purchasing insurance would. *Id.* Language that is clear and unambiguous must be given effect in accordance with its plain meaning and may not be construed by the courts. *O.S.T. ex rel. G.T. v. BlueShield*, 181 Wn.2d 691, 696, 335 P.3d 416 (2014). When interpreting language of an insurance contract, we construe the entire contract together for the purpose of giving force and effect to each clause. *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 710, 375 P.3d 596, *as amended on denial of reconsideration*, (Aug. 15, 2016).

Since Title 48 RCW governs the business of title insurance, it "'is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters.'" *Campbell v. Ticor Title Ins. Co.*, 166 Wn.2d 466, 471, 209 P.3d 859 (2009) (quoting RCW 48.01.030). These duties help inform an insurer's duty to defend. *Id.*

The duty to defend "is broader than the duty to indemnify." *Id.* If the insurance policy *conceivably covers* the allegations in the complaint, the duty to defend is triggered; yet, the duty to indemnify only exists if the policy *actually covers* the insured's liability. *Id.*; *see also Am.*

*Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 404, 229 P.3d 693 (2010); *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 53, 164 P.3d 454 (2007). A title insurer must defend unless it is clear from the face of the complaint that the claim is not covered by the applicable policy. *Campbell*, 166 Wn.2d at 471. "'If it is not clear from the face of the complaint that the policy provides coverage, but coverage could exist, the insurer *must* investigate and give the insured the benefit of the doubt that the insurer has a duty to defend.'" *Id.* (internal alteration omitted) (quoting *Woo*, 161 Wn.2d at 53).

B.      Duty to Defend

The Robbinses argue that MCTI had a duty to defend. MCTI argues that where there is no coverage, there is no duty to defend and that the Robbinses' policy did not afford coverage. We agree with the Robbinses that MCTI had a duty to defend because the policy conceivably covers the allegations in the complaint.

Their policy states, in pertinent part:

> 1. The Company shall have the right to, and will, at its own expense, defend the insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein.

CP at 232. There is no dispute that the Robbinses are the named "insured" under the policy. We note also that the record contains no evidence the Tribe commenced any "legal proceedings" against the Robbinses and that this fact is likewise undisputed. Thus, our initial inquiry involves whether the Tribe's assertion of its right to harvest shellfish constituted a "demand" "founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to" June 12, 1978, the date the Robbinses' policy issued. CP at 230.

The Robbinses' policy does not define "demand," "title," "encumbrance" or "exist." Accordingly, we must give effect to language which is clear and unambiguous in keeping with its plain meaning. *O.S.T. ex rel. G.T.*, 181 Wn.2d at 696. We may not construe clear and unambiguous contract terms. *Id.*

A "demand" is commonly defined to be "[t]he assertion of a legal or procedural right." BLACK'S LAW DICTIONARY 522 (10th ed. 2014). The Tribe clearly asserted its legal rights under *United States v. State of Washington* in its notification and plan to harvest shellfish on the Robbinses' tidelands. Therefore, the Tribe made a "demand" as contemplated by the plain meaning of the policy.

"Title" is commonly defined as, "[l]egal evidence of a person's ownership rights in property; an instrument (such as a deed) that constitutes such evidence." BLACK'S LAW DICTIONARY 1712 (10th ed. 2014). The Tribe has not founded its demand on a claim of title to the Robbinses' property, as it is commonly understood. Nor does it claim to have possession or custody of the shellfish on the Robbinses' property, or an instrument, such as a deed, giving it ownership of the tidelands.

Our Supreme Court has defined an "encumbrance" as "a burden upon land depreciative of its value, such as a lien, easement, or servitude, which, though adverse to the interest of the landowner, does not conflict with his conveyance of the land in fee." *Hebb v. Severson*, 32 Wn.2d 159, 167, 201 P.2d 156 (1948). Based on this definition, the Tribe's demand can be commonly understood as founded on an encumbrance: the Tribe's treaty rights are adverse to the interest of the Robbinses, but do not conflict with their right of conveyance.

"Exist" has many definitions, but we can fairly define it as "coming into being." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 796 (1966). The Robbinses argue the right

to harvest shellfish came into being when the Treaty was signed and subsequently ratified by the President and Senate of the United States.

The Treaty established the Tribes' right to take fish at usual and accustomed places. On September 2, 1993, the United States District Court for the Western District of Washington ruled that "shellfish" are "fish," within the meaning of the Treaties. *United States v. State of Washington*, 873 F. Supp. 1422, 1427 (W.D. Wash. 1994), *aff'd in part*, *reversed in part*, 135 F.3d 618 (1998). On appeal, the Ninth Circuit affirmed, in part, the district court's interpretation in *United States v. State of Washington*, 157 F.3d 630, 638-39 (9th Cir. 1998). The Ninth Circuit held, among other matters, that various treaties granted several tribes a right to take shellfish that was coextensive with their right to take fish except as expressly limited by the Shellfish Proviso. The Shellfish Proviso prohibited tribes from taking shellfish "from any beds staked or cultivated by citizens," and excluded tribes from artificial shellfish beds created by private citizens. *Id*.

Courts have made clear that Indian treaties should not be viewed as grants of rights to the Indians, but as grants of rights from the Indians to the United States. *United States*, 873 F. Supp. at 1428-29; *see also United States v. State of Washington*, 19 F. Supp. 3d 1126, 1129 (W.D. Wash. 1994) ("Any rights which were not granted by the Indians to the United States were reserved by the Indians because the Indians already possessed them."); *State v. Buchanan*, 138 Wn.2d 186, 199-200, 202-03, 978 P.2d 1070 (1999). Relevant to the instant appeal, the Ninth Circuit has reasoned:

> "At [Treaty] time, . . . the Tribes had the absolute right to harvest any species they desired, consistent with their aboriginal title. . . . The fact that some species were not taken before treaty time-either because they were inaccessible or the Indians chose not to take them-does not mean that their *right* to take such fish was limited. Because the 'right of taking fish' must be read as a reservation of the Indians' pre-existing rights, and because the right to take *any* species, without limit, pre-existed the Stevens Treaties, the Court must read the 'right of taking fish' without any species limitation."

*United States*, 157 F.3d at 644 (alterations in original) (quoting *United States*, 873 F. Supp. at 1430).

The Treaty was signed on December 26, 1854, ratified on March 3, 1855, and "proclaimed" on April 10, 1855. *State v. Courville*, 36 Wn. App. 615, 618, 676 P.2d 1011 (1983). MCTI issued the Robbinses their title policy on June 12, 1978. Thus, the Tribe's claim of a right to take shellfish from the Robbinses' tidelands is a demand founded on a claim of encumbrance arising before the date of inception of the policy. Section 1 of the conditions and stipulations of the Robbinses' policy, set out above, conceivably provides coverage for such a demand. Therefore, under *Campbell*, *American Best Food*, and *Woo*, we must examine the policy's exceptions to determine whether any exception excludes coverage of the Robbinses' claims, thus negating the duty to defend.

C.      General Exceptions

The Robbinses argue that the general exception for "public or private easements not disclosed by the public records" does not apply. Br. of Appellant at 31-45. We agree with the Robbinses that, under Washington law, the Tribe's treaty rights are not easements and that therefore the general exception does not apply. Consequently, we need not reach whether it is conceivable to argue the Tribe's treaty rights were "disclosed by the public records."

The United States Supreme Court has held that the Stevens Treaties "imposed a servitude" on land. *United States v. Winans*, 198 U.S. 371, 381, 25 S. Ct. 662, 49 L. Ed. 1089 (1905). The Treaty, *Winans* held, "was not a grant of rights to the Indians, but a grant of right from them,-a reservation of those not granted." 198 U.S. at 381.

"A servitude is a legal device that creates a right or obligation that runs with the land." *Lake Limerick Country Club v. Hunt Mfg. Homes, Inc.*, 120 Wn. App. 246, 253, 84 P.3d 295

(2004).[4] "A servitude can be, among other things, an easement, profit, or covenant." *Id*. at 298-99. Therefore, easements and profits are two distinct types of servitudes. An easement "is a right to enter and use property for some specified purpose." *Affil. FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 458, 243 P.3d 521 (2010). On the other hand, "[a] cousin of easements, a profit a prendré [sic], 'is the right to sever and to remove some substance from the land.'" *Id*. (quoting 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE, § 2.1 Property Law at 80 (2d ed. 2004)). For example, a holder of a profit typically has rights to natural resources such as "'minerals, gravel, or timber.'" *Id*. (quoting 17 WASHINGTON PRACTICE: REAL ESTATE, § 2.1 at 80). The nuances of a profit à prendre are illustrated by its definition in *Black's Law Dictionary*:

> "A profit à prendre has been described as 'a right to take something off another person's land.' This is too wide; the thing taken must be something taken out of the soil, i.e., it must be either the soil, the natural produce thereof, or the wild animals existing on it; and the thing taken must at the time of taking be susceptible of ownership. A right to 'hawk, hunt, fish, and fowl' may thus exist as a profit, for this gives the right to take creatures living on the soil which, when killed, are capable of being owned. But a right to take water from a spring or a pump, or the right to water cattle at a pond, may be an easement but cannot be a profit; for the water, when taken, was not owned by anyone nor was it part of the soil."

BLACK'S LAW DICTIONARY 1404 (10th ed. 2014) (quoting ROBERT E. MEGARRY & M.P. THOMPSON, A MANUAL OF THE LAW OF REAL PROPERTY, at 375-76 (6th ed. 1993)).

The Robbinses argue that the Tribe's treaty rights are not easements, but rather are a sui generis aboriginal right and cannot readily be classified under English common law. They argue also that the treaty rights are a form of servitude more closely analogous to a profit à prendre

---

[4] *See also* "servitude" in *Black's Law Dictionary* 1577 (10th ed. 2014):
> 1. An encumbrance consisting in a right to the limited use of a piece of land or other immovable property without the possession of it; a charge or burden on an estate for another's benefit <the easement by necessity is an equitable servitude>. • Servitudes include easements, irrevocable licenses, profits, and real covenants.

than an easement and, thus, should not be swept into the current of the general exception, which specifies easements.

MCTI counters that we should construe tribal shellfish rights as easements. MCTI claims a profit à prendre is a form of easement and although there may be distinctions among various forms of easements, that does not mean they are not still easements. MCTI cites a definition contained in the *Restatement (Third) of Property* to argue that "'[a] profit a prendre *is an easement* that confers the right to enter and remove timber, mineral, oil, gas, game, or other substance from the land in possession of another.'" Br. of Resp't at 17-18 (emphasis added) (quoting RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2 (2000)).

The Tribe's treaty "right of taking fish, at all usual and accustomed grounds and stations," which includes the right to take shellfish, inescapably entails the right to come onto the Robbinses tidelands and harvest shellfish from the seabed. This right is akin to a profit à prendre, although the right of access by itself is more like an easement. As stated, an easement and a profit à prendre are distinctly different categories of servitudes, nuanced and definable. Because the policy does not define the term "easement," it is at best ambiguous as applied to the Tribe's right. Because ambiguities in insurance policies are to be interpreted in favor of the insured, *Holden*, 169 Wn.2d at 756, and because we "strictly and narrowly construe insurance policy exclusions," *Campbell*, 166 Wn.2d at 472, we hold that the Tribe's treaty right to harvest shellfish more closely resembles a profit à prendre rather than an easement and, therefore, the general exception does not apply.

Because the policy conceivably provides coverage, and because no general exceptions apply, we hold MCTI owed the Robbinses a duty to defend. Consequently, the superior court

erred when it granted MCTI's motion for summary judgment and denied the Robbinses' cross-motion for partial summary judgment.

## II. BAD FAITH

The Robbinses argue that because MCTI unreasonably breached its duty to defend, it acted in bad faith as a matter of law and, therefore, should be estopped from denying coverage. We agree.

An insurer acts in bad faith if its breach of the duty to defend was unreasonable, frivolous, or unfounded. *Am. Best Food*, 168 Wn.2d at 412. The insured does not establish bad faith, however, when the insurer denies coverage or fails to provide a defense based on a reasonable interpretation of the insurance policy. *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 560, 951 P.2d 1124 (1998). The duty to defend requires an insurer to give the insured the benefit of the doubt when evaluating whether the insurance policy provides coverage. *Am. Best Food*, 168 Wn.2d at 412-13; *Campbell*, 166 Wn.2d at 471; *Woo*, 161 Wn.2d at 53.

If an insurer is uncertain as to its duty to defend, it may defend under a reservation of rights while seeking a declaratory judgment that it has no such duty. *See, e.g.*, *Kirk*, 134 Wn.2d at 563 n.3; *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 761, 58 P.3d 276 (2002); *Woo*, 161 Wn.2d at 54; *Campbell*, 166 Wn.2d at 471; *Am. Best Food*, 168 Wn.2d at 405. "A reservation of rights is a means by which the insurer avoids breaching its duty to defend while seeking to avoid waiver and estoppel." *Truck*, 147 Wn.2d at 761. "'When that course of action is taken, the insured receives the defense promised and, if coverage is found not to exist, the insurer will not be obligated to pay.'" *Id*. (quoting *Kirk*, 134 Wn.2d at 563 n.3).

If we conclude that the insurer breached the duty to defend in bad faith, we presume harm from the insurer's actions. *Kirk*, 134 Wn.2d at 562-63. In that event, we hold the insurer liable

for the cost of any defense and estop the insurer from asserting that there is no coverage. *Id.* at 563-65.

MCTI did not defend under a reservation of rights while seeking a declaratory judgment as to coverage under the Robbinses' policy. Instead, MCTI denied coverage even though, as shown above, its policy exception for easements was at best ambiguous in its application. Because ambiguities in insurance policies are to be interpreted in favor of the insured, *Holden*, 169 Wn.2d at 756, and policy exclusions are to be strictly and narrowly construed, *Campbell*, 166 Wn.2d at 472, MCTI acted unreasonably in denying a defense. *See Am. Best Food*, 168 Wn.2d at 413. Thus, we hold MCTI acted in bad faith as a matter of law. *See id.* Under *Kirk*, 134 Wn.2d at 562, 563-65, we presume harm to the Robbinses and hold that MCTI is estopped from denying the Robbinses coverage under the title insurance policy subject to the remaining question of affirmative defenses.

### III. AFFIRMATIVE DEFENSES

MCTI argues that it should be given the opportunity to argue the affirmative defenses it pled in its answer. We agree.

CR 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of a pleading, but a response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

In their reply brief, the Robbinses argue that because MCTI failed to prove up or argue its affirmative defenses to the superior court, it cannot now assert them as a defense to its liability for its bad faith breach of its duty to defend. The Robbinses cite CR 56(e) and *Labriola v. Pollard Group., Inc.*, 152 Wn.2d 828, 840-42, 100 P.3d 791 (2004), for the proposition that MCTI had the burden of setting forth specific facts showing that there is a genuine issue for trial.

In its answer, MCTI pled several affirmative defenses. The Robbinses' cross-motion for partial summary judgment did not seek summary judgment on any of MCTI's affirmative defenses. In its response to the Robbinses' cross-motion, however, MCTI argued, among other matters, that its affirmative defenses are to some degree based in fact and it had not had the opportunity to conduct discovery, in particular, on the defenses of statute of limitations, laches, waiver, and mitigation of damages.

The Robbinses' cross-motion for summary judgment asserted that that their policy afforded coverage, no general exceptions applied, and MCTI had a duty to defend. Their cross-motion did not request summary judgment on any of MCTI's affirmative defenses. Nevertheless, MCTI responded in part by noting its affirmative defenses and stating that it had not had the opportunity to conduct needed discovery on them.

CR 56(e), set out above, by its terms requires a party opposing summary judgment to set forth specific facts showing there is an issue for trial in opposition to the motion that was made. Where, as here, the plaintiff does not request summary judgment on a number of affirmative defenses, CR 56(e) does not require the defendant to show an issue of fact concerning them. Similarly, *Labriola* does not require the party opposing a summary judgment motion to set forth facts about an issue that was not raised by the motion. In that case, the party opposing summary judgment failed to bring forth sufficient facts to substantiate its counterclaims, which the trial court in fact had dismissed. *Labriola,* 152 Wn.2d at 840-42. The Robbinses, in contrast, did not even request summary judgment on MCTI's affirmative defenses.

For these reasons, MCTI's affirmative defenses are yet to be decided. We remand for the superior court to consider them, subject to the other holdings in this opinion.

IV. ATTORNEY FEES

The Robbinses request attorney fees and costs incurred both in the superior court and on appeal. They base these requests on RCW 48.30.015(3), part of the Insurance Fair Conduct Act, and on *Olympic Steamship Company*, *v. Centennial Insurance Company*, 117 Wn.2d 37, 51-53, 811 P.2d 673 (1991). Because the merits of MCTI's affirmative defenses are not yet decided, any decision on attorney fees and costs is premature.

CONCLUSION

We reverse the superior court's order granting MCTI's motion for summary judgment and denying the Robbinses' cross-motion for partial summary judgment. We hold that MCTI owed a duty to defend under the policy, its failure to do so constituted bad faith, and MCTI is estopped from denying coverage. We decline to rule on the request for attorney fees and costs, and we remand to the superior court to consider the merits of MCTI's affirmative defenses.

Bjorgen, J.

We concur:

Worswick, P.J.

Sutton, J.