[No. 64261-8-I.   Division One.   October 18, 2010.]

DAVE ROBBINS CONSTRUCTION, LLC, *Appellant*, v. FIRST AMERICAN TITLE COMPANY, *Respondent*.

896

*Jordan Foster* and *Kelly Ann Delaat-Maher* (of *Maher Ahrens Foster Shillito PLLC*), for appellant.

*Ann T. Marshall* (of *Bishop White Marshall & Weibel PS*), for respondent.

¶1 SPEARMAN, J. — Dave Robbins Construction LLC (DRC) obtained preliminary commitments for title insurance and title insurance policies from First American Title Company for five lots on which DRC planned to build homes. After purchasing the lots, DRC learned they were located in a historical district designation and received stop-work orders requiring the company to obtain archeological surveys. DRC sued First American, alleging breach of contract and bad faith. We hold First American had no obligation to investigate the Washington historical register, that it did not deliver unmarketable title, and that it did not breach the insurance contract. As such, we affirm the trial court's dismissal under CR 12(b)(6).

## FACTS

¶2 DRC purchased five lots within Green Valley Estates, a six-lot subdivision in King County, for the purpose of building homes. DRC obtained preliminary commitments for title insurance and title insurance policies from First American Title Company for each of the five lots.

¶3 After purchasing the lots, DRC applied for building permits and began improvements. In March 2008, DRC received stop-work orders for three of the five lots. The stop-work orders required DRC to obtain archeological surveys because the lots were located within a historical district designation. DRC obtained the surveys and found archeological artifacts on one of the lots, delaying development of all three lots.

¶4 DRC sued First American, alleging that First American should have discovered the historical district designation, that the designation negatively impacted the title, that DRC "may" not have purchased the lots had it known about the designation, and that First American committed bad faith in refusing to provide coverage under its policies. First American filed a CR 12(b)(6) motion to dismiss on grounds that the title insurance policies discussed in the complaint did not provide coverage for DRC's claims. The trial court granted the motion, and DRC appeals.

## DISCUSSION

### Standard of Review

¶5 A dismissal under CR 12(b)(6) is for "failure of the pleading to state a claim upon which relief can be granted." "On a 12(b)(6) motion, a challenge to the legal sufficiency of the plaintiff's allegations must be denied unless no state of facts which plaintiff could prove, consistent with the complaint, would entitle the plaintiff to relief on the claim." *Halvorson v. Dahl*, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978). "This weeds out complaints where, even if what the plaintiff alleges is true, the law does not provide a remedy." *McCurry v. Chevy Chase Bank, FSB*, 169 Wn.2d 96, 101, 233 P.3d 861 (2010). We review de novo the propriety of a trial court's dismissal of an action under CR 12(b)(6). *Burton v. Lehman*, 153 Wn.2d 416, 422, 103 P.3d 1230 (2005).

### Failure To Identify Historical District

¶6 DRC contends First American's failure to identify and disclose the lots as being located in a historical district constitutes a breach of contract. DRC identified no provisions requiring such an investigation in any of the five title insurance policies at issue here, nor do those policies contain such a provision. To the extent DRC is referring to the investigation undertaken by First American prior to the issuance of the preliminary commitments for title insurance, we reject this argument.

¶7 "[A] preliminary commitment is a statement submitted to the potential insured establishing the terms and conditions upon which the title insurer is willing to issue a title policy." *Barstad v. Stewart Title Guar. Co.*, 145 Wn.2d 528, 536, 39 P.3d 984 (2002) (citing RCW 48.29.010(3)(c)). "Significantly, the Legislature clearly established that a preliminary commitment is *not* a represen-

tation of the condition of title, but a 'statement of terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted.'" *Id.* (quoting RCW 48.29.010(3)(c)). As such, these preliminary reports "are not abstracts of title, nor are any of the rights, duties, or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report." *Id.* at 540. The purpose of the investigation before the preliminary commitment is to help the title insurance company set the scope of the policy. *Id.* ("title insurance companies conduct the necessary research to determine the scope of the policy that they will offer to the potential insured"). As such, the Supreme Court in *Barstad* held there was no general disclosure duty in preliminary commitments from title insurance companies. *Id.* at 544. In other words, the purpose of First American's investigation was to determine the scope of the title policy it would issue to DRC; as a matter of law, First American owed no duty of disclosure to DRC, and the trial court did not err in dismissing on this ground.

## Coverage for Unmarketable Title

¶8 DRC next contends First American breached its insurance contracts and committed bad faith by failing to provide coverage for damage caused by unmarketable title. We disagree.

¶9 As a preliminary matter, First American did not issue the same policies for each of the five lots. The policies issued for lots 1 and 6 are based on a 2006 ALTA (American Land Title Association) title insurance policy form, whereas the policies issued for lots 3, 4, and 5 are based on a 1992 ALTA title insurance policy form. DRC is correct that both forms grant coverage for damages arising from unmarketable title. The 1992 form defines "unmarketability of the title" as follows:

An alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a

purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

The 2006 form defines "unmarketable title" as follows:

Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

¶10 DRC contends it did not have marketable title because the historical district designation "significantly burdened" its ability to develop the land. DRC, however, has confused an economic lack of marketability with title marketability. The *American Law Reports* discussion of this distinction is instructive:

A difference exists between economic lack of marketability, which relates to physical conditions affecting use of property, and title marketability, which relates to defects affecting legally recognized rights and incidents of ownership. One can hold perfect title to land that is valueless; one can have marketable title to land while land itself is unmarketable.

Joel E. Smith, Annotation, *Defects Affecting Marketability of Title Within Meaning of Title Insurance Policy*, 18 A.L.R. 4ᴛʜ 1311, § 2 (Supp. 2010). Indeed, those courts that have addressed the issue of whether defects in the physical condition of the property are covered by title insurance policies have generally held that such defects do not constitute unmarketability of title. *See, e.g., Chi. Title Ins. Co. v Investguard, Ltd.*, 215 Ga. App. 121, 449 S.E.2d 681 (1994) (location of part of property in flood plain); *Chi. Title Ins. Co. v. Kumar*, 24 Mass. App. Ct. 53, 506 N.E.2d 154 (1987) (existence of hazardous waste); *Title & Trust Co. of Fla. v. Barrows*, 381 So. 2d 1088 (Fla. App. 1979) (platted street bordering lot); *Hocking v. Title Ins. & Trust Co.*, 37 Cal. 2d 644, 234 P.2d 625 (1951) (failure to obtain permits providing for the grading and paving of the streets in the subdivision).

¶11 DRC cites *Hebb v. Severson*, 32 Wn.2d 159, 201 P.2d 156 (1948) and 92 C.J.S. *Vendor and Purchaser* § 326 (2000) in support of its position. Those authorities are of no help to DRC. C.J.S. merely provides that marketable title must be free from "reasonable" objection, and in *Hebb*, title was not marketable because the city of Seattle had an ownership interest in the property, namely an easement to maintain a water main upon and across the property. *Hebb*, 32 Wn.2d at 162-63.

¶12 Here, unlike in *Hebb*, there was no other party with a recorded ownership interest in the property. In other words, there were no defects affecting legally recognized rights and incidents of ownership of DRC's properties, and title was not "unmarketable" under the policies. As such, the trial court properly dismissed the claims for failing to provide coverage for damage caused by unmarketable title.

### Coverage for Stop-Work Orders

¶13 DRC also argues First American breached its insurance contracts and committed bad faith by failing to provide coverage for damage caused by the stop-work orders. DRC alleges that the damages suffered as a result of the stop-work orders are specifically covered by provision 5 of the "Covered Risks" section of its policy with First American. We note that DRC was subject to stop-work orders on only three of the lots: 3, 5, and 6, and as such, only the policies issued for those lots are at issue in this case. Additionally, as is described above, First American did not issue the same policies for each of the five lots. The following chart describes the parcels of land at issue in this case, and the policies issued for those parcels:

| Lot | Policy No. | Issued | Policy Form | Stop Work |
|-----|-----------|--------|-------------|-----------|
| 1 | 986456 | 3/30/2007 | 2006 | No |
| 3 | 816531 | 5/17/2006 | 1992 | Yes |
| 4 | 816536 | 5/17/2006 | 1992 | No |
| 5 | 816543 | 5/17/2006 | 1992 | Yes |
| 6 | 986450 | 3/6/2007 | 2006 | Yes |

¶14 The language granting coverage in the 1992 forms differs from that of the 2006 forms. The sections granting coverage in the 1992 form policies are relatively small in scope and focus specifically on defects in title. By contrast, the sections granting coverage in the 2006 form policies contain additional coverage, including the coverage identified by DRC in provision 5, which reads as follows:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, FIRST AMERICAN TITLE INSURANCE COMPANY . . . insures . . . against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

. . . .

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(a) the occupancy, use, or enjoyment of the Land;

(b) the character, dimensions, or location of any improvement erected on the Land;

(c) the subdivision of land; or

(d) environmental protection

If a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

¶15 Again, the above-quoted language can be found only in the policy for one of the three lots subject to a stop-work order, lot 6. Thus, the question on review of this CR 12(b)(6) dismissal is whether any facts could exist showing DRC was entitled to coverage under the above provision for damage from the historical designation stop-work order on lot 6. *Halvorson*, 89 Wn.2d at 674. For the reasons described

below, we conclude such facts cannot exist, and we affirm the trial court.

¶16 DRC argues coverage exists under this provision because the stop-work order amounts to enforcement of governmental regulations. DRC ignores, however, that the insurance policy at issue here is not a general liability policy, but is a title insurance policy. The purpose of title insurance is "to provide assurance to purchasers of real property that their *ownership* [is] safe and secure." 3 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 39.2 (3d ed. 1996). Indeed, by the plain language of the policy, coverage exists for damage from regulation enforcement only "if a notice, describing any part of the Land, is recorded in the Public Records setting forth the . . . intention to enforce[.]" Here, unlike those cases where an easement is recorded at the county auditor's office, there were no notices of violation or intent to take enforcement action recorded with the county auditor.

¶17 DRC claims no such notices need be recorded with the county recorder because the term "public records" as used in the policy includes all records on file with all governmental agencies, including the list of properties kept in the Washington heritage register established by RCW 27.34.220. We disagree. Under the policy, public records are only those records established for the purpose of imparting constructive notice of matters relating to real property to potential purchasers:

> "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

Contrary to DRC's argument, there is nothing in chapter 27.34 RCW declaring the purpose of the Washington heritage register is to impart constructive notice of matters

relating to real property to potential purchasers, and under *Ellingsen v. Franklin County*, 117 Wn.2d 24, 27, 810 P.2d 910 (1991), such a declaration is necessary to provide constructive notice.

¶18 In *Ellingsen*, Franklin County claimed a conveyance of an easement gave constructive notice to a bona fide purchaser when that conveyance was filed in the county engineer's office, even though it was not recorded with the county auditor. The Supreme Court disagreed, holding this interpretation would render title searches impossible and useless:

> Under the County's theory all records of these multiple, scattered public offices would impart constructive notice of everything contained in those records because, like the engineer's office, those are public records in public offices. . . . To import constructive notice from every piece of paper or computer file in every government office, from the smallest hamlet to the largest state agency, would wreak havoc with the land title system. As a matter of fact, it would render impossible a meaningful title search.

*Ellingsen*, 117 Wn.2d at 29-30. For this reason, the court held that to give constructive notice of matters relating to real property, a statute must specifically declare the statute is intended to give constructive notice. *Id.* at 27. "In the absence of such declaration there is no constructive notice." *Id.* Here, the statute establishing the Washington heritage register contains no declaration it is intended to provide constructive notice to potential purchasers of real property, and as such, it does not provide such notice. The list of properties kept in the Washington heritage register therefore is not a "Public Record" under the policy, and the trial court properly dismissed the claim.

¶19 Affirmed.

DWYER, C.J., and BECKER, J., concur.