**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MAY 7, 2020

*Stephe, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MAY 7, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LESLIE W. and HARLENE E. ROBBINS, husband and wife, | ) ) ) ) | No. 96726-1 |
| Respondents, | ) ) ) | En Banc |
| v. | ) ) | |
| MASON COUNTY TITLE INSURANCE COMPANY; and RETITLE INSURANCE COMPANY, | ) ) ) ) ) | Filed May 7, 2020 |
| Petitioners. | ) ) ) ) | |

WIGGINS, J.P.T.[*]—We are asked to decide whether Mason County Title Insurance Company (MCTI) had a duty to defend insured property owners when a Native American tribe announced it planned to assert its treaty right to harvest shellfish from the property. Further, this case asks whether a moving party seeking summary judgment on liability must specifically move for summary judgment on affirmative defenses.

---

[*] Justice Charles Wiggins is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

The duty to defend is broad and if an insurance policy conceivably provides coverage, the insurer must defend or be found to have breached the duty. If this breach is unreasonable, the insurer acted in bad faith.

In the present case, we affirm the Court of Appeals and remand to the superior court for further proceedings consistent with this opinion. We hold that because the insurance policy conceivably covered the treaty right and no exceptions to coverage applied, MCTI owed the property owners a duty to defend and, in failing to do so, breached the duty. Because this breach was unreasonable given the uncertainty in the law, MCTI acted in bad faith. Further, because the property owners did not seek summary judgment on MCTI's affirmative defenses, we remand to the superior court for consideration of the defenses. Accordingly, we decline to rule on the property owners' request for attorney fees as premature.

FACTS AND PROCEDURAL HISTORY

In 1854, the Washington Territory and nine Native American tribes, including the Squaxin Island Tribe (the Tribe), entered into the 1854 Treaty of Medicine Creek (the Treaty). *See* 10 Stat. 1132. Under the Treaty, the nine tribes relinquished their rights to the land but retained "the right of taking fish at all usual and accustomed grounds and stations . . . , in common with all citizens of the Territory." Clerk's Papers (CP) at 67. The District Court for the Western District of Washington has interpreted "fish" under the Treaty to include shellfish. *United States v. Washington*, 873 F. Supp. 1422, 1430 (W.D. Wash. 1994), *aff'd in part, reversed in part,* 135 F.3d 618 (9th Cir. 1998). The Ninth Circuit agreed that this right to take fish includes the right to harvest shellfish from private lands within the usual and accustomed places with naturally

2

occurring shellfish beds, but not artificial shellfish beds. *Washington*, 135 F.3d at 643, 645-46. The Tribe's treaty right is not disputed in this case.

In 1978, Leslie and Harlene Robbins (Robbins[1]) purchased property in Mason County that included tidelands with manila clam beds. CP at 224. In connection with the purchase of the property, Robbins obtained a standard policy of title insurance from MCTI.[2] The policy provides that MCTI will insure Robbins "against loss or damage sustained by reason of: . . . [a]ny defect in, or lien or encumbrance on, said title existing at the date hereof." *Id.* at 229. Specifically,

> [MCTI] shall have the right to, and will, at its own expense, defend the insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein.

*Id.* at 232. Under "[g]eneral [e]xceptions," the policy excludes from coverage "public or private easements not disclosed by the public records." *Id.* at 231. "[P]ublic records" is defined under the policy as "records which, under the recording laws, impart constructive notice with respect to said real estate." *Id.* at 232. No other pertinent terms are defined under the policy.

For years Robbins had contracted with commercial shellfish harvesters to enter Robbins's property to harvest shellfish from the tidelands. *Id.* at 224. In 2015, after another contract expired, Robbins began negotiations with a different shellfish harvester. *Id.* at 225. Although the harvester had reason to believe Robbins's clam beds were not natural and, thus, not part of the Treaty, he notified the Tribe of his

---

[1] For ease of reference we refer to the Robbinses collectively as the singular "Robbins." We intend no disrespect.

[2] MCTI is now known as Retitle Insurance Company. CP at 23.

intent to harvest shellfish from Robbins's property. *Id.* at 225-26. The Tribe responded that it needed more information about the tidelands, that it disagreed with the harvester's assertion that Robbins's tidelands did not include natural clam beds, and referred him to the Tribe's rights under the 2002 Shellfish Implementation Plan.[3] *Id.* at 234-35.

Having learned of the Tribe's letter and having consulted with counsel, Robbins ultimately tendered a claim to MCTI to defend against the Tribe's demand to enter Robbins's property to harvest clams. *Id.* at 225. On July 26, 2015, the Tribe sent Robbins a formal letter to notify them of the Tribe's plan to enter their property and harvest shellfish in accordance with the federal court's interpretation of the Treaty in *Washington*[4] and the 2002 Shellfish Implementation Plan. *Id.* at 225, 241.

MCTI denied Robbins's request for a defense because, in MCTI's view, the Tribe's asserted right is an "easement[]" and "[a] treaty between the federal government and a Native American Indian tribe is not a record that imparts constructive notice pursuant to Washington law." *Id.* at 225, 244. Thus, MCTI claimed the Tribe's treaty rights were "not within the scope of this policy." *Id.* at 245.

Robbins then filed suit against MCTI in Mason County Superior Court, alleging in pertinent part that MCTI breached its duty to defend. *Id.* at 321. MCTI denied the

---

[3] The Shellfish Implementation Plan was created to give guidance and implement various tribes' shellfish harvesting rights. *See id.* at 241.

[4] There are multiple pertinent cases by this name in the course of the Treaty litigation, but the Tribe's letter does not indicate to which specific case it is referring.

allegations, arguing that the policy did not cover the circumstances alleged and raised 10 additional affirmative defenses.[5] *Id.* at 300-04.

MCTI moved for summary judgment, asking the court to dismiss the complaint with prejudice on the ground that there is no duty to defend because there is no coverage under the policy. *Id.* at 274-81. Robbins filed a cross motion for partial summary judgment, urging the court to find that MCTI had a duty to defend and, by not doing so, that MCTI breached its duty. *Id.* at 272.

The superior court granted MCTI's motion for summary judgment, denied Robbins's motion for partial summary judgment, and dismissed Robbins's claims with prejudice. *Id.* at 4-5.

Robbins appealed again, alleging that MCTI breached the duty to defend because the Tribe's letter was a demand under the policy, and the asserted right is *not* an easement and *is* disclosed by public record. Robbins also asked for reasonable attorney fees under *Olympic Steamship Co. v. Centennial Insurance Co.,* 117 Wn.2d 37, 811 P.2d 673 (1991). MCTI again argued that there was no duty to defend as the Tribe did not initiate legal proceedings and the asserted right *is* an easement *not* disclosed by the public records. MCTI also noted that the superior court had not yet considered MCTI's affirmative defenses.

The Court of Appeals reversed the order granting summary judgment, holding that the Tribe's letter was a "demand" under the policy that triggered the duty to defend, the Tribe's asserted right is a profit à prendre (hereinafter "profit") and that a

---

[5] These include, among others, statute of limitations, laches, failure to mitigate damages, and waiver. *See id.* at 303.

5

profit is not an easement. *Robbins v. Mason County Title Ins. Co.*, 5 Wn. App. 2d 68, 425 P.3d 885 (2018). The Court of Appeals did not reach whether the Tribe's Treaty rights were "disclosed by the public records." *Id.* at 79. Finding the breach of the duty to defend "unreasonable," the Court of Appeals held that as a matter of law, MCTI acted in bad faith. *Id.* at 82-83. The Court of Appeals remanded to the superior court for consideration of MCTI's affirmative defenses as Robbins did not specifically move for summary judgment on the affirmative defenses. *Id.* at 84-85. Accordingly, the Court of Appeals did not rule on attorney fees because they would be premature until affirmative defenses were decided on remand. *Id.* at 85.

MCTI petitioned this court for review of whether MCTI had a duty to defend, whether the Tribe's right was excluded from coverage, and whether the Court of Appeals properly considered the issue of whether MCTI acted in bad faith when it was not raised by either party at the trial court. MCTI's Pet. for Discr. Review at 2. In their answer to the petition for review, Robbins opposed review but asked that if we granted review, we also grant review of the Court of Appeals' remand for consideration of MCTI's affirmative defenses, and Robbins again asked for attorney fees. Robbins's Ans. to Pet. for Review at 1-2. We granted review of all issues in the petition for review and the answer to the petition for review.

## ISSUES

I.      Whether MCTI had a duty to defend against the Tribe's asserted right.

II.     Whether MCTI acted in bad faith in failing to defend.

6

III.     Whether MCTI was required to create a genuine issue of material fact as to its affirmative defenses even when Robbins did not move for summary judgment on the defenses.

IV.     Whether Robbins is entitled to attorney fees.

ANALYSIS

We review an order for summary judgment de novo and engage in the same inquiry as the superior court. *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 52, 164 P.3d 454 (2007).

"We interpret insurance policy provisions as a matter of law." *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 404, 229 P.3d 693 (2010) (citing *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 575, 964 P.2d 1173 (1998)). When interpreting an insurance policy, we give the language its plain meaning, construing the policy as the average person purchasing insurance would. *Woo*, 161 Wn.2d at 52. Any ambiguity in the policy is interpreted in favor of the insured. *Am. Best Food*, 168 Wn.2d at 411.

In the insurance context, the duty to defend is broader than the duty to indemnify. *Woo*, 161 Wn.2d at 52. An insurance company has the duty to indemnify if the insurance policy *actually* covers the insured, while the duty to defend arises if the insurance policy *conceivably* covers the insured. *Am. Best Food*, 168 Wn.2d at 404. An insurer is relieved of the duty to defend only if the policy clearly does not cover the claim. *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 760, 58 P.3d 276 (2002). "If the complaint is ambiguous, it will be liberally construed in favor of triggering

7

the insurer's duty to defend." *Id.* (citing *R.A. Hanson Co. v. Aetna Ins. Co.*, 26 Wn. App. 290, 295, 612 P.2d 456 (1980)).

    I.    <u>MCTI had a duty to defend because the insurance policy conceivably covered the Tribe's asserted right and no general exceptions apply</u>

As an initial matter, MCTI argues that it was not obligated to defend the claim when tribal fishing rights have been "effectively determined" and litigated in *United States v. Washington*, 384 F. Supp. 312 (1974). Suppl. Br. of MCTI at 2. In that case, United States District Court Judge Boldt determined that the Hammersley Inlet (where Robbins's property is located) is within the Tribe's usual and accustomed area. *Washington*, 384 F. Supp. at 377-78. However, in his declaration, Robbins does not dispute that the Tribe has a treaty right or that the general area where his property is located is part of the Tribe's usual and accustomed fishing grounds. CP at 225-26. He makes the more limited claim that the harvester he hired had reason to believe that the clam bed was not *natural* and thus not subject to the Treaty. *See id.* Whether Robbins's tidelands contain natural or artificial clam beds was not previously litigated in the cases interpreting the Treaty.

    A.    <u>The Tribe's letter was a "demand" within the meaning of the insurance policy</u>

MCTI also argues that Robbins's policy did not afford coverage for the Tribe's letter indicating the intent to harvest shellfish from Robbins's property because the Tribe did not initiate legal proceedings against Robbins. Suppl. Br. of MCTI at 6-7. In contrast, Robbins argues that the letter was a "demand" such that it triggered the duty

to defend under the language of the policy. Suppl. Br. of Robbins at 6-7. We agree with Robbins.

The insurance policy between MCTI and Robbins indicates that MCTI "will, at its own expense, defend the insured with respect to all *demands* and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein." CP at 232 (emphasis added). It is undisputed that the Tribe did not begin any "legal proceedings" that would trigger coverage under the policy. Thus, the question is whether the Tribe's letter is a "demand" that triggered the duty to defend.[6]

As the Court of Appeals notes, the insurance policy does not define "demand." *See Robbins*, 5 Wn. App. 2d at 77. Thus, we give "demand" its plain and ordinary meaning.

A "demand" is "the asking or seeking for what is due or claimed as due." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 598 (2002). Similarly, *Black's Law Dictionary* defines "demand" as "[t]he assertion of a legal or procedural right." BLACK'S LAW DICTIONARY 542 (11th ed. 2019). Here, the Tribe asserted its legal right to harvest shellfish on Robbins's tidelands by sending Robbins a letter stating that the Tribe was seeking the shellfish it was due. Thus, the plain meaning of the policy supports concluding that the letter was a demand.

---

[6] Although the Court of Appeals went through an analysis of the plain meaning of words other than "demand," MCTI challenges only the conclusion that the letter was a "demand" sufficient to trigger the duty to defend. *See* MCTI's Pet. for Discr. Review at 7-9; Suppl. Br. of MCTI at 6-7.

9

MCTI argues that the duty to defend can be triggered *only* once legal proceedings have been initiated. Suppl. Br. of MCTI at 6. MCTI cites language from our case law that supports MCTI's argument. *See* MCTI's Pet. for Discr. Review at 8. For example, in *Woo* we indicated that the duty to defend "'arises at the time an action is first brought, and is based on *the potential for liability*.'" 161 Wn.2d at 52 (quoting *Truck Ins. Exch.*, 147 Wn.2d at 760); *see also Am. Best Food*, 168 Wn.2d at 404 (quoting the same). However, these cases do not indicate the actual policy language relied upon.

In contrast, in *United Services Automobile Ass'n v. Speed*, 179 Wn. App. 184, 317 P.3d 532 (2014), the Court of Appeals held that a demand letter can be sufficient to trigger the duty to defend depending on the language of the policy. The court reasoned that although "[m]ost Washington cases recite that the insurer's duty to defend is triggered when a complaint is filed against the insured[,] [t]he cases reference a 'complaint' because most standard policies require the insurer to defend only a 'suit' against the insured." *Id.* at 195 (citations omitted) (citing *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 420-21, 191 P.3d 866 (2008); *Woo*, 161 Wn.2d at 52). Further, the policy at issue in that case indicated that the insurer's "duty to defend arose not only when a 'suit' was brought against the insured, but also when any 'claim' was made for damages." *Id.* Therefore, the Court of Appeals held that the insurer's duty to defend was triggered when the injured party sent the demand letter. *Id.*

The policy language in the present case indicates that MCTI will defend not only against legal proceedings but also against demands. Therefore, the duty to

defend was triggered when the Tribe sent the letter to Robbins, and MCTI was required to defend Robbins unless an exception under the policy applied.

### B.     No exception applies that would relieve MCTI from its duty to defend

When interpreting an insurance policy, "[w]e strictly and narrowly construe . . . [exceptions]."[7] *Campbell v. Ticor Title Ins. Co.*, 166 Wn.2d 466, 472, 209 P.3d 859 (2009). When determining if an exception applies, "[t]he lack of any Washington case directly on point . . . present[s] a legal uncertainty with regard to [an insurer's] duty," and "any uncertainty works in favor of providing a defense to an insured." *Am. Best Food*, 168 Wn.2d at 408.

The insurance policy excepts from coverage "public or private easements not disclosed by the public records." CP at 231. Therefore, if the Tribe's asserted right either is *not* an easement or *is* disclosed by public records, then the exception does not apply and MCTI had a duty to defend. In determining whether the right is an easement not disclosed by public record, we are mindful that any uncertainty is construed in favor of Robbins.

MCTI argues that the Tribe's asserted right is an easement. Suppl. Br. of MCTI at 12. In contrast, Robbins argues that the right is a profit and that a profit is a type of servitude distinct from an easement. Suppl. Br. of Robbins at 11-12.

In *United States v. Winans*, 198 U.S. 371, 381, 25 S. Ct. 662, 49 L. Ed. 1089 (1905), the United States Supreme Court held that the fishing rights reserved by the

---

[7] Our case law frequently refers to "exclusions." *See, e.g.*, *Campbell v. Ticor Title Ins. Co.*, 166 Wn.2d 466, 472, 209 P.3d 859 (2009). However, because the policy language and parties refer to "exceptions" to the policy instead of "exclusions," we use "exceptions" in this opinion.

Native Americans through the Yakama Nation treaty[8] "imposed a servitude upon every piece of land as though described therein."

"A servitude is a legal device that creates a right or obligation that runs with the land" that "can be, among other things, an easement, profit, or covenant." *Lake Limerick Country Club v. Hunt Mfd. Homes, Inc.*, 120 Wn. App. 246, 253, 84 P.3d 295 (2004) (citing 1 RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1(1), (2), at 8 (AM. LAW INST. 2000) ("The servitudes covered by this Restatement are easements, profits, and covenants."). The Court of Appeals interpreted this to mean that "easements and profits are two distinct types of servitudes." *Robbins*, 5 Wn. App. 2d at 80.

Our prior decisions help us to define easements and profits, and we hold that the Tribe's right squarely fits within the definition of a profit. We have defined an easement as "a right to enter and use property for some specified purpose." *Affil. FM Ins. Co. v. LTK Consulting Servs., Inc.,* 170 Wn.2d 442, 458, 243 P.3d 521 (2010) (plurality opinion). "Familiar easements are for driveways, roads, and utility lines." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 2.1, at 80 (2d ed. 2004). In contrast, we have defined a profit as "'the right to sever and to remove some substance from the land.'" *Affil. FM Ins. Co.*, 170 Wn.2d at 458 (quoting 17 STOEBUCK & WEAVER, *supra*, at 80). We have also reasoned that timber cutting rights should be interpreted as a "profit *à prendre*, a right to take

---

[8] The fishing rights in the Yakama Nation treaty are very similar to those reserved in the Treaty of Medicine Creek. *Compare* 10 Stat. 1132 (Treaty of Medicine Creek), *with* 12 Stat. 951 (Treaty with the Yakama, 1855).

the profits of the land by entering onto it and cutting and removing the timber." *Layman v. Ledgett*, 89 Wn.2d 906, 911, 577 P.2d 970 (1978). The Tribe's right to enter onto Robbins's tidelands and remove shellfish is very similar to that of one who can enter into another's land, cut down trees, and remove the timber. Therefore, the treaty right is a profit.

Because we hold the Tribe's right is a profit, we also examine the interplay of easements and profits. If a profit is *clearly* an easement, then this part of the exception applies. If a profit is not an easement, or there is uncertainty in the case law as to whether a profit is an easement, then the exception does not apply and MCTI had a duty to defend.

MCTI argues that even if the Tribe's right is a profit, a profit is a type of easement, and thus the exclusion should apply. MCTI's argument does have merit. Although the *Restatement* calls out easements and profits as types of servitudes, it also defines a "profit" as "*an easement* that confers the right to enter and remove timber, minerals, oil, gas, game, or other substances from land in the possession of another." RESTATEMENT § 1.2(2) (emphasis added). Further, when discussing Native American fishing rights under a different treaty, we found that "the treaty secured to the Indians a servitude, or *easement*, upon the land at their usual and accustomed places." *State v. McCoy*, 63 Wn.2d 421, 433, 387 P.2d 942 (1963) (emphasis added). The United States Supreme Court has similarly found that hunting and fishing rights, although a profit, are also an easement. *See New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 562, 36 S. Ct. 705, 60 L. Ed. 1166 (1916) ("We assume that [the

13

Seneca] retained an easement [to hunt and fish], or profit *à prendre*, to the extent defined [in the Treaty of Big Tree of 1797].").

However, more recently, a plurality of this court has referred to profits as "[a] cousin of easements," implying that a profit is *not* a type of easement. *Affil. FM Ins. Co.*, 170 Wn.2d at 458. *Washington Practice: Real Estate*: *Property Law*, although not binding authority, similarly refers to profits and easements as separate types of servitudes. *See* 17 STOEBUCK & WEAVER, *supra*, at 80 ("The basic *distinction* between easements and profits is that an easement is a right to go upon another's land and more or less to use it, whereas a profit is the right to sever and to remove some substance from the land." (emphasis added)). However, this treatise also states that the "distinction between easements and profits . . . may become blurred in practice" because profits "carr[y] with [them] easements to get at the subject of the profit." *Id*. at 81. This line is further blurred "with certain kinds of rights that are difficult to categorize as being clearly one or the other." *Id.* While logically one who holds a profit must also hold an easement to enter the land to reach the subject of the profit, it is unclear under Washington law whether a profit is a different type easement or a distinct servitude altogether.

Because the core issue in the present case is whether Washington law is clear as to the interplay of profits and easements, we decline to explicitly decide whether a profit is an easement or whether they are two distinct types of servitude. What we recognize in this case is that the various authorities we rely on disagree as to whether a profit is a type of easement, and this uncertainty in the law must be construed in favor of the insured and coverage under the policy agreement. While we have

previously stated that Native American fishing rights are an easement, as noted above, the rights appear to be more akin to a profit, and our case law has not explicitly stated whether a profit is a type of easement. However, a plurality of this court has implied profits are servitudes distinct from an easement. Thus, our case law, in conjunction with persuasive authority, creates uncertainty in the law. Because under *American Best Food* any uncertainty in the law must be construed in favor of the insured, the policy exception for "easements" does not apply to the Tribe's right, and MCTI had a duty to defend.[9] MCTI therefore breached this duty when it did not defend against the Tribe's demand.

II.     MCTI acted in bad faith because it unreasonably failed to defend against an asserted right

The Court of Appeals found that MCTI unreasonably breached the duty to defend and, thus, acted in bad faith as a matter of law and is estopped from denying coverage. *Robbins*, 5 Wn. App. 2d at 72. We agree.

"An insurer acts in bad faith if its breach of the duty to defend was unreasonable, frivolous, or unfounded." *Am. Best Food*, 168 Wn.2d at 412. When an insurer is unsure as to whether the duty to defend applies, "it may defend under a reservation of rights while seeking a declaratory judgment that it has no duty to defend." *Truck Ins. Exch.* 147 Wn.2d at 761. This reservation of rights means that the insurer "avoids breaching its duty to defend while seeking to avoid waiver and

---

[9] Because we find that the exception does not apply, we do not reach the issue of whether a Treaty is "disclosed by public record."

estoppel" while giving the insured the benefit of the doubt. *Id.* When an insurer wrongfully refuses to defend, there is a rebuttable presumption of harm to the insured. *Am. Best Food*, 168 Wn.2d at 411-12 (citing *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 563, 951 P.2d 1124 (1998)). When an insurer breaches in bad faith, it is estoped from denying coverage. *Kirk*, 134 Wn.2d at 564.

In *American Best Food*, we held that the insurer acted in bad faith as a matter of law when it declined to defend based on its own interpretation of the law. 168 Wn.2d at 411. In that case, a nightclub patron sued American Best Food's nightclub for negligence when employees "dump[ed] him on the sidewalk" after he had been shot by another patron. *Id.* at 403. The insurer, Alea, refused to defend because the insurance policy included an exception for injuries arising from assault and battery. *Id.* At the time of the case, Washington case law indicated that preassault negligence was included in an assault and battery exclusion because the cause of action still arose from the actual assault. *Id.* at 406-07 (citing *McAllister v. Agora Syndicate, Inc.,* 103 Wn. App. 106, 11 P.3d 859 (2000)). Alea relied on this case law to deny coverage.

However, because Washington courts had never determined whether there is a distinction between preassault negligence and postassault negligence in the context of a policy exclusion, we looked to out of state authority. *Id.* at 407-08. We found the out of state authority that concluded there was a duty to defend in the case of postassault negligence, even with a policy exclusion for assault and battery, persuasive. *Id.* We noted that "[t]he lack of any Washington case directly on point and a recognized distinction between preassault and postassault negligence presented a legal uncertainty with regard to Alea's duty." *Id.* at 408. Because the insurer must put

16

the insured's needs before its own, following an arguable, but not conclusive, interpretation of Washington law was not consistent with giving the insured "the benefit of any doubt as to the duty to defend." *Id.* at 413. Accordingly, the reliance on the insurer's interpretation was unreasonable, and we held that Alea acted in bad faith as a matter of law when it did not defend. *Id.*

The present case is very similar to *American Best Food*. Here, MCTI did not defend under a reservation of rights but, instead, refused to defend based on its own interpretation of the policy and the law. As discussed above, the law regarding whether the Tribe's asserted right is an easement or a profit and whether a profit is an easement is unclear within Washington. Our case law is at best uncertain as to those questions that must be construed in favor of the insured and that trigger the duty to defend. Just as the insurance company in *American Best Food* acted unreasonably when it relied on its own interpretations of Washington case law, so did MCTI in the present case. Therefore, we hold that MCTI breached the duty of good faith as a matter of law and presume harm to Robbins. Given the presumption of harm, MCTI is estopped from denying coverage unless an affirmative defense applies, as discussed below.

     III.    <u>The superior court must consider MCTI's affirmative defenses on remand because Robbins did not move for summary judgment on the defenses</u>

"The purpose of a motion under the civil rules is to give the other party notice of the relief sought." *Pamelin Indus., Inc. v. Sheen-U.S.A., Inc.*, 95 Wn.2d 398, 402, 622 P.2d 1270 (1981) (emphasis omitted). Under CR 7(b)(1), motions "shall state with particularity the grounds therefor, and shall set forth the relief or order sought." Under

CR 56(a), a party may "move . . . for a summary judgment in the party's favor upon all or any part thereof." This includes moving for summary judgment "on the issue of liability." CR 56(c). Further, in response, "an adverse party may not rest upon the mere allegations or denials of a pleading, but a response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." CR 56(e). Taken together, CR 7 and CR 56 stand for the proposition that a party moving for summary judgment must state, with particularity, the grounds on which it seeks summary judgment in order to give the opposing party notice of the relief sought. The opposing party can then respond with any genuine issues of material fact in regard to the contents of the motion.

In his cross motion for partial summary judgment, Robbins sought summary judgment that MCTI "owed, and breached, a duty to defend." CP at 252. The only reference to affirmative defenses in the motion is that "[u]nder [*American Best Food*]*,* the Court should go no farther in analyzing the applicability of the insurer's defenses than to determine that no clear legal authority establishes these defenses definitely apply so as to justify the insurer's denial of a defense to the Robbins." *Id*. at 272 (boldface and underlining omitted). But *American Best Food* does not discuss affirmative defenses. As explained above, *American Best Food* concerns the duty to defend when case law is unclear. It does not stand for the proposition that an insurance company can have no affirmative defense without clear legal authority. Further, asking the court *not* to analyze the insurer's defenses cannot be seen as seeking summary judgment on those defenses. Given that Robbins did not state with particularity that he was seeking summary judgment on the issue of affirmative

defenses, MCTI cannot be said to have been given notice that summary judgment on the affirmative defenses was the relief sought.

In its response to the cross motion, MCTI nonetheless noted its affirmative defenses again and explained that the parties had not engaged in discovery to explore the facts related to the affirmative defenses, so there may still be an issue of material fact. *Id.* at 33-37. But as the Court of Appeals correctly held, MCTI did not need to create a genuine issue of material fact under CR 56(e) with respect to the affirmative defenses because Robbins had not moved for summary judgment on the defenses.

Relying in part on *Labriola v. Pollard Group, Inc.*, 152 Wn.2d 828, 840-42, 100 P.3d 791 (2004), Robbins argues that because he sought summary judgment on the issue of liability and MCTI did not create a genuine issue of material fact as to its affirmative defenses to liability, MCTI cannot assert its affirmative defenses on remand. Suppl. Br. of Robbins at 16-17. In *Labriola*, we examined affirmative defenses that were dismissed upon one party's motion. The opposing party sought to have the defenses reinstated on remand to the superior court; however, because there was no factual dispute as to the defenses and the trial court had made correct rulings as to each defense, we did not reinstate the defenses on remand. *Labriola*, 152 Wn.2d at 840-41. But *Labriola* and the present case are materially distinguishable. Here, Robbins did not move to dismiss the affirmative defenses, MCTI has alleged a need for discovery to determine facts, and the superior court has not ruled on any of the defenses.

Because Robbins did not seek summary judgment on MCTI's defenses and the superior court has not ruled on any of MCTI's affirmative defenses, we remand to the

superior court for consideration of the defenses, consistent with the other holdings in this opinion.

IV.    Robbins is not entitled to attorney fees at this time because the
       superior court must still consider MCTI's affirmative defenses

Robbins claims that they are entitled to reasonable attorney fees and costs pursuant to *Olympic Steamship Co.*, 117 Wn.2d 37, and the Insurance Fair Conduct Act. *See* RCW 48.30.015(3) (awarding attorney fees "after a finding of unreasonable denial of a claim for coverage"). Because we remand to the superior court for consideration of MCTI's affirmative defenses, Robbins's request for attorney fees is premature. Therefore, we decline to rule on this issue.

### CONCLUSION

We affirm the Court of Appeals and remand to the superior court for consideration of MCTI's affirmative defenses. We hold that MCTI had a duty to defend Robbins against the Tribe's asserted right and that MCTI breached that duty in bad faith when it unreasonably failed to do so. Further, we hold that CR 56 requires parties moving for summary judgment on liability to explicitly move for summary judgment on the affirmative defenses if they would like the court to rule on them. Because Robbins did not do so, we remand to the superior court for consideration of MCTI's affirmative defenses. Finally, we decline to rule on the issue of attorney's fees as premature.

Wiggins, J. PT

WE CONCUR.

Stephens, C.J.          González, J.

Yu, J.

Owens, J.          Mxa, J.P.T.

*Robbins v. Mason County Title Ins.*

No. 96726-1

MADSEN, J. (dissenting)—The majority determines that the Squaxin Island Tribe's letter sent to Leslie and Harlene Robbins (collectively Robbins), informing Robbins of the tribe's plan to harvest shellfish on Robbins' tidelands at a specific time and date was sufficient to trigger Robbins' title insurer's duty to defend under Robbins' title insurance policy. For the reasons discussed below, I disagree.

Robbins' title insurance policy with Mason County Title Insurance Company (MCTI) provided in part that "subject to the conditions and stipulations of this policy, [MCTI] does hereby insure . . . 'the insured' . . . against loss or damage sustained by reason of . . . [a]ny defect in, or lien or encumbrance on, said title existing at the date hereof." Clerk's Papers (CP) at 229. The policy stated that "[MCTI] shall have the right to, and will, at its own expense, defend the insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein." *Id*. at 232. The policy's stated "[g]eneral [e]xceptions" expressly excluded from coverage "public or private easements not disclosed by the public records." *Id*. at 231.

The policy also defined "public record" as "records which, under the recording laws, impart constructive notice with respect to said real estate." *Id*. at 232.

Robbins received the letter in question, dated July 26, 2016, from Rana Brown, the "Shellfish Biologist [for the] Squaxin Island Tribe." *Id*. at 241-42. The letter was entitled "Notification of Squaxin Island Tribe Plan To Harvest on Non-Commercial, Privately Owned Tidelands at {183 SE Morgan Rd}." *Id*. at 241. The letter informed Robbins, "This letter notifies you of the shellfish survey outcome on your tidelands, and of the upcoming Tribal clam harvest(s) there." *Id*. The letter explained, "As background, some years ago the federal courts . . . confirmed the [Tribe's] rights under the 1854 Treaty of Medicine Creek to take a 50% share of the harvestable biomass of each shellfish species within the Tribe['s] usual and accustomed grounds and stations. These lands include privately owned tidelands such as those surrounding Vaughn Bay." *Id*. The letter provided a web address that contained documents including a court-approved "Shellfish Implementation Plan" that described the process for notifying private landowners for tideland surveys and harvests, and for resolving disagreements. *Id*. The letter informed Robbins that the tribe had conducted a shellfish population survey the previous May, estimating the tribe's "Treaty share in pounds (50%)" on Robbins' property to be 3,391 pounds, and noted the planned harvest time and date set for the following August. *Id*. at 241-42. The letter noted that "[d]uring the harvest, the Tribe will follow the requirements of the Implementation Plan and other order[s] issued by the courts." *Id*. at 242. The letter further explained, "Tribal Harvesters may only access

2

tidelands by boat" and "Tribal harvests are for commercial purposes and clams will be weighed out and sold to an authorized buyer on the beach immediately after the dig." *Id.* The letter closed by stating, "Please feel free to contact me with any questions or concerns," provided contact information, and concluded, "We look forward to working with you and trying to accommodate any concerns you may have. Thank you for your consideration." *Id.*

I

I disagree that this letter prompted MCTI's duty to defend. As noted, the title policy provides that MCTI "will . . . defend the insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein." *Id.* at 232. First, there was no lawsuit triggering the insurer's duty to defend. This court's decisions and federal cases applying Washington law indicate that the insurer's duty to defend arises in the context of a lawsuit filed against the insured, which did not occur here. This court explained at length in *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 52-54, 164 P.3d 454 (2007), as follows:

> The rule regarding the duty to defend is well settled in Washington and is broader than the duty to indemnify. *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55, 64, 1 P.3d 1167 (2000). The duty to defend "arises at the time *an action* is first brought, and is based on *the potential for liability.*" *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 760, 58 P.3d 276 (2002) (emphasis added). An insurer has a duty to defend "'when *a complaint* against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage.'" *Id.* (quoting *Unigard Ins. Co. v. Leven*, 97 Wn. App. 417, 425, 983 P.2d 1155 (1999)). An insurer is not relieved of its duty to

3

defend unless *the claim alleged in the complaint* is "clearly not covered by the policy." *Id.* (citing *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 561, 951 P.2d 1124 (1998)). Moreover, if *a complaint* is ambiguous, a court will construe it liberally in favor of "triggering the insurer's duty to defend." *Id.* (citing *R.A. Hanson Co. v. Aetna Ins. Co.*, 26 Wn. App. 290, 295, 612 P.2d 456 (1980)). In contrast, the duty to indemnify "hinges on the insured's *actual liability* to the claimant and *actual coverage* under the policy." *Hayden*, 141 Wn.2d at 64 (emphasis added). In sum, the duty to defend is triggered if the insurance policy *conceivably covers* the *allegations in the complaint*, whereas the duty to indemnify exists only if the policy *actually covers* the insured's liability.

       "There are two exceptions to the rule that the duty to defend must be determined only from *the complaint*, and both the exceptions favor the insured." *Truck Ins.*, 147 Wn.2d at 761. First, if it is not clear from *the face of the complaint* that the policy provides coverage, but coverage could exist, the insurer *must* investigate and give the insured the benefit of the doubt that the insurer has a duty to defend. *Id.* Notice pleading rules, which require only a short and plain statement of the claim showing that the pleader is entitled to relief, impose a significant burden on the insurer to determine if there are *any* facts in *the pleadings* that could conceivably give rise to a duty to defend. *Hanson*, 26 Wn. App. at 294. Second, if the *allegations in the complaint* """"conflict with facts known to or readily ascertainable by the insurer,"""" or if """"the allegations . . . are ambiguous or inadequate,"""" facts outside *the complaint* may be considered. *Truck Ins.*, 147 Wn.2d at 761 (quoting *Atl. Mut. Ins. Co. v. Roffe, Inc.*, 73 Wn. App. 858, 862, 872 P.2d 536 (1994) (quoting *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 908, 726 P.2d 439 (1986))). The insurer may not rely on facts extrinsic to *the complaint* to deny the duty to defend—it may do so only to trigger the duty. *Id.*

(Some emphasis added) (alteration in original) (footnote omitted). This court reiterated these requirements in *American Best Food, Inc. v. Alea London, Ltd.*, stating, "The duty to defend is triggered if the insurance policy *conceivably covers* allegations in *the complaint*." 168 Wn.2d 398, 404, 229 P.3d 693 (2010) (citing *Woo*, 161 Wn.2d at 53) (second emphasis added). "'The duty to defend arises when *a complaint against the insured*, construed liberally, alleges facts which could, if proven, impose liability upon

the insured within the policy's coverage.'" *Id*. at 404-05 (emphasis added) (internal

quotation marks omitted) (quoting *Truck Ins. Exch.*, 147 Wn.2d at 760). Federal cases

applying Washington law cite the same rule linking the insurer's duty to defend to the

filing of a complaint against the insured. *See Hay v. Am. Safety Indem. Co.*, 752 F.

App'x. 460, 461 (9th Cir. 2018) (relying on the same "duty to defend arises" language

quoted above from *Am. Best Food*, 168 Wn.2d at 404-05); *Or. Mut. Ins. Co. v. Seattle

Collision Ctr. Inc*., 403 F. App'x. 249, 250-51 (9th Cir. 2010) (same); *Nat'l Union Fire

Ins. Co. of Pittsburgh, Pa. v. Coinstar, Inc.*, 39 F. Supp. 3d 1149, 1156 (W.D. Wash.

2014) (same). As noted, there was no lawsuit filed against Robbins that would trigger

MCTI's duty to defend.[1]

## II

Further, I disagree that the tribe submitted a "demand" sufficient to trigger the

insurer's duty to defend. *See* majority at 9. As noted above, the insurer's duty to defend

arises in the context of a lawsuit against the insured and no such suit is present in this

case. Further, the letter the tribe sent to Robbins merely informed the landowner of the

tribe's plan to harvest clams on Robbins' tidelands. It contains particulars and logistical

information about when and what to expect. The tribe's letter is informational and lacks

the character of a *demand*, i.e., the assertion of a legal right. Such assertion *is*

demonstrated in the letter by Robbins' attorney to the title insurer, which stated, "On

---

[1] After oral argument, Robbins filed a statement of additional authority citing *Webb v. USAA
Cas. Ins. Co.*, ___ Wn. App. 2d ___, 457 P.3d 1258 (2020), but the *Webb* opinion concerned an
insurer who declined to defend an insured when a lawsuit was filed against the insured. That is
not the case here.

5

behalf of the Robbins, I hereby tender and assert a claim against Mason County Title

Insurance Company and demand a defense pursuant to the policy of title insurance it

issued to the Robbins." CP at 238. The tribe's letter, as described above, contains no

similar "demand" language. *See id*. at 240-42.

The majority relies on *United Services Automobile Ass'n v. Speed*, 179 Wn. App.

184, 317 P.3d 532 (2014) (*USAA*), as supporting its view that the tribe's letter triggered

MCTI's duty to defend. But that case is quite different from Robbins' case. *USAA*

concerned an assault by an insured causing personal injuries to a victim during a road

rage incident. The victim's attorney submitted a demand letter to the insured seeking

$650,000 in compensation for the victim's injuries.[2] *Id*. at 189. Settlement negotiations

ensued, and the insured stipulated to entry of a $1.4 million judgment in exchange for the

victim's covenant not to execute the judgment against the insured's assets and the

assignment of all the insured's potential claims (breach of contract, bad faith, etc.) against

USAA to the victim, who then pursued those claims against USAA. *Id*. at 192.

Ultimately, the Court of Appeals affirmed the trial court's grant of summary judgment to

USAA, holding that USAA had no duty to defend because the incident did not amount to

an "accident" as required for coverage under either the insured's homeowners or auto

policy. *Id*. at 189.

---

[2] The insured was criminally prosecuted for the incident, and a jury convicted him of third degree assault. *Id*. at 191.

Relevant to the majority's reliance on *USAA*, in that case, USAA's homeowners and auto policies provided that the insurer's duty to defend arose both when a "suit" was brought against the insured, and also when any "'claim' . . . for damages" was made arising from acts covered under the policies. *Id*. at 195. Importantly, the insurer conceded on appeal that the language in the policies triggered a duty to defend when the victim asserted a claim against the insured. In light of that concession, the Court of Appeals held, "Accordingly, here any duty to defend was triggered when Speed [the victim] sent his demand letter to Geyer [the insured], and the duty to defend is based on the allegations in that letter." *Id.* The Court of Appeals went on to analyze the allegations contained in the demand letter against the policy provisions and ultimately determined that no duty to defend was triggered. In other words, under the particular facts of *USAA* (including the insurer's concession), there was no dispute as to the *timing* of the *availability* of the duty to defend in *USAA*. The court then looked to the allegations in the demand letter to determine if the duty to defend had been *substantively* triggered under the policy provisions and determined that the insurer had no duty to defend against the victim's demand letter. *Id*. at 199-200.

There is no similar concession here nor is there a similar demand letter from an assault victim's attorney asserting a claim for damages and seeking compensation. In my view, the tribe's informational letter as described above was not a demand triggering MCTI's duty to defend.

7

III

Next, I disagree with the majority that no exception applies that would relieve MCTI from its duty to defend. Majority at 11. As noted, the title policy expressly excepts from coverage "public or private easements not disclosed by the public records." CP at 231.

I specifically disagree with the majority's view that as regards the presence of an easement, an uncertainty is present here that would require construing the policy in favor of coverage. Majority at 14-15. The majority describes the tribe's treaty right to harvest shellfish on Robbins' tidelands as a profit à prendre and relies on the absence of a clear demarcation between a profit and an easement as the relevant uncertainty that would require construing the title policy in favor of coverage for the insured. The majority is correct that an easement is defined as "'a right to enter and use property for some specified purpose.'" Majority at 12 (quoting *Affil. FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 458, 243 P.3d 521 (2010) (plurality opinion)). And a profit à prendre is defined as "'the right to sever and to remove some substance from the land.'" *Id*. (internal quotation marks omitted) (quoting *Affil. FM Ins.*, 170 Wn.2d at 458). But here the tribe's treaty right to harvest shellfish on Robbins' tidelands is not disputed. Such harvesting necessarily includes entering Robbins' tidelands, digging the clams, and removing the clams from Robbins' tidelands. Even if the tribe only attempted to harvest but found no clams to remove, the tribe would still have entered and used Robbins' tidelands for purposes of the harvest. That the harvest (even if unsuccessful) necessarily

8

requires the *entry and use* of the tidelands establishes that the right asserted by the tribe entails an easement. Regardless of how the removal of the shellfish may be characterized, the necessity of entry and use of the tideland for purposes of the harvest is crystal clear. There is no uncertainty that entry and use of the tideland (the definition of an easement) is required under the tribe's treaty right. For these reasons, I disagree with the majority's view that no easement is present for purposes of the policy exclusion noted above.

Because, in my view, an easement *is* present, I turn to the second element of the relevant policy exclusion, whether the tribe's asserted treaty right (which, as noted, necessarily entails an easement) is "disclosed by the public records."[3]  CP at 231. I disagree with Robbins' view that the treaty's existence in United States statutes is sufficient to put the title insurer on notice of its existence and content. *See* Suppl. Br. of Robbins at 12-13. The policy expressly excludes "public or private easements not disclosed by the public records."  CP at 231. As noted, the policy defines "public records" as "records which, under the recording laws, impart constructive notice with respect to said real estate."  *Id*. at 232. In Washington, such public recording means recorded at the county auditor's office. For example, in *Dave Robbins Construction, LLC v. First American Title Co.*, 158 Wn. App. 895, 904-05, 249 P.3d 625 (2010), Division One of the Court of Appeals held that a title insurer had no obligation to search the Washington historical register before issuing a title policy. As here, "public records" was

---

[3] The majority did not reach this issue. *See* majority at 15 n.9.

defined as "those records established for the purpose of imparting constructive notice of matters relating to real property to potential purchasers." *Id*. at 904. The listing of property on the state heritage register (rather than with the county auditor) was insufficient to impart constructive notice of matters relating to real property to potential purchasers. In so holding, Division One relied on this court's decision in *Ellingsen v. Franklin County*, 117 Wn.2d 24, 27, 810 P.2d 910 (1991), explaining as follows:

> In *Ellingsen*, Franklin County claimed a conveyance of an easement gave constructive notice to a bona fide purchaser when that conveyance was filed in the county engineer's office, even though it was not recorded with the county auditor. The Supreme Court disagreed, holding this interpretation would render title searches impossible and useless:
>> Under the County's theory all records of these multiple, scattered public offices would impart constructive notice of everything contained in those records because, like the engineer's office, those are public records in public offices. . . . To import constructive notice from every piece of paper or computer file in every government office, from the smallest hamlet to the largest state agency, would wreak havoc with the land title system. As a matter of fact, it would render impossible a meaningful title search.
> *Ellingsen*, 117 Wn.2d at 29-30. For this reason, the court held that to give constructive notice of matters relating to real property, a statute must specifically declare the statute is intended to give constructive notice. *Id*. at 27. "In the absence of such declaration there is no constructive notice." *Id*. Here, the statute establishing the Washington heritage register contains no declaration it is intended to provide constructive notice to potential purchasers of real property, and as such, it does not provide such notice. The list of properties kept in the Washington heritage register therefore is not a "Public Record" under the policy, and the trial court properly dismissed the claim [against the insurer].

*Dave Robbins Constr.*, 158 Wn. App. at 905 (first alteration in original). The same is true here; as noted, the title insurance policy at issue excludes from coverage encumbrances that are not disclosed in the public record, meaning not recorded with the

county auditor.  The tribe's treaty rights were not recorded with the county auditor and, thus, were excluded from the title policy by its express terms.

For the reasons discussed above, in my view, MCTI had no duty to defend based on the tribe's letter to Robbins.  Accordingly, I dissent.

_madsen, J._

No. 96726-1

GORDON McCLOUD, J. (concurring in dissent)—I agree with the majority
that an insurance contract may contain a term that requires the insurer to "defend"
an insured against "demands" even before a complaint is filed. Majority at 8-10. I
also agree with the majority that the insurance policy at issue here contained such a
term: the policy states that insurer Mason County Title Insurance Company
(MCTI) "will … defend the insured with respect to *all demands* and legal
proceedings founded upon a claim [of certain types]." Clerk's Papers at 232
(emphasis added).

But the dissent is correct that there was no such "demand" made in this
case and, hence, there was no duty placed on MCTI to "defend." Rather, the
Squaxin Island Tribe sent Leslie and Harlene Robbins (collectively Robbins) a
letter giving the background of its rights under the 1854 Treaty of Medicine Creek
along with its plan to exercise those treaty rights in the future. Dissent at 3-7.

1

I would end the analysis there. Specifically, I do not join the dissent's further assertion that the treaty is "not disclosed in the public record." Dissent at 10 (Squaxin Island Tribe's treaty rights are "not disclosed in the public record, meaning not recorded with the county auditor."). This limitation on the authoritativeness, breadth, and public nature of Indian treaties like the one at issue here contradicts controlling case law.

Actually, treaties—including treaties between the United States government and an Indian tribe—constitute the "supreme law of the land." *State v. Buchanan*, 138 Wn.2d 186, 201, 978 P.2d 1070 (1999) ("[A] treaty with Indians is the supreme law of the land and is binding on the State until Congress limits or abrogates the treaty." (citing U.S. CONST. art. VI; *Antoine v. Washington*, 420 U.S. 194, 201, 95 S. Ct. 944, 43 L. Ed. 2d 129 (1975); *State v. McCormack*, 117 Wn.2d 141, 143, 812 P.2d 483 (1991))). That means "A treaty [with a Tribe] constitutes an express federal law." *Cougar Den, Inc. v. Dep't of Licensing*, 188 Wn.2d 55, 60, 392 P.3d 1014 (2017), *aff'd*, __ U.S. __, 139 S. Ct. 1000, 203 L. Ed. 2d 301 (2019).

To be sure, many laws—like zoning and other local laws—might well constitute matters outside the "public record" as defined here. But the treaty in this case—which is an "express federal law" and the "supreme law of the land"—is different. The treaty at issue here contains an explicit retention (not a conveyance)

2

of a property right (not a regulation) in the original owner (not a transferee).  No recording was necessary to make that a matter of public record for all purposes.

I therefore concur in the dissent.

Gordon McCloud, J.

Johnson, J.